UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| Sarah Beth Cain, | ) | |
| | ) | |
| Plaintiff, | ) | NO. 2:17-cv-00055 |
| | ) | CHIEF JUDGE CRENSHAW |
| v. | ) | MAGISTRATE JUDGE FRENSLEY |
| TENNESSEE TECHNOLOGICAL | ) | |
| UNIVERSITY, MARC BURNETT, | ) | |
| individually and in his official capacity, | ) | |
| KATHERINE WILLIAMS, individually | ) | |
| and in her official capacity, ROBERT | ) | |
| OWENS, individually and in his official | ) | |
| )capacity, KAE CARPENTER,  individually | ) | |
| and in her official capacity, MARLENE | ) | |
| HALL, individually and in her official | ) | |
| capacity | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

---

### PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND MOTION FOR DE NOVO DETERMINATION

---

On August 8, 2018, Magistrate Judge Frensley filed the Report and Recommendation

("R&R")(Docket No. 38), recommending that Defendants' Motion To Dismiss Plaintiff's

Second Amended Complaint should be granted. Under 28 U.S.C. § 636(b)(1)(C), "any party may

serve and file objections to the proposed findings and recommendations of the Magistrate

Judge."  Plaintiff respectfully submits specific objections and reasoning behind those objections

in this document.

### BACKGROUND

Plaintiff, Sarah Beth Cain, filed her Second Amended Complaint "Second Amended Complaint" (Docket No. 17) on December 29, 2017, against Tennessee Technological University ("TTU")("University") , and Marc Burnett, Katherine Williams, Robert Owens, Kae Carpenter and Marlene Hall ("individual Defendants")(collectively, "Defendants") for violations of Title IX of the Education Amendment Acts of 1972, violations of Plaintiff's due process rights under 42 U.S.C. § 1983, and two state claims for intentional and negligent infliction of emotional distress.

Specifically, Plaintiff's causes of action are as follows: TTU violated its obligations under Title IX by failing to conduct a timely investigation into Plaintiff's report of being raped by another student and Defendants thereby facilitated a sexually hostile educational environment and prevented Plaintiff from accessing resources provided by the University. Furthermore, Defendants' conduct departed significantly from the procedures outlined in Tennessee Technological Policy 143: Sexual Misconduct ("Policy 143") (*See* Exhibit 1), and Defendants' refusal to abide by their own policies deprived Plaintiff of property and liberty interests that she was due, without giving her notice or an opportunity to be heard.

On November 12, 2015, Plaintiff met with Defendant Hall to file an administrative complaint against her attacker ("Respondent") and to request that TTU investigate the assault and take appropriate disciplinary action against Respondent. Defendants did not interview Respondent until March 12, 2016, four months after Plaintiff filed her complaint.

On May 17, 2016, Plaintiff met with Title IX Coordinator, Defendant Hall and the Title IX Investigator, Defendant Owens, to answer follow-up questions, but Defendants declined to provide Plaintiff with an anticipated day that an investigation would be concluded. Despite

multiple requests by Plaintiff, Defendants refused to conclude the investigation for another 10 months after their May 17 meeting, or to give a reason for the excessive delay.

On March 30, 2017, Plaintiff was notified that the investigation had been completed and she subsequently received an email with an attached Investigative Memorandum ("Memorandum"). *See* Exhibit 2. The first page of the Memorandum was addressed to Defendant Marc Burnett and was dated January 26, 2017. The Memorandum recommended that the matter be forwarded to the Office of the Dean of Students for appropriate disciplinary action. To the best of Plaintiff's knowledge, there was never any disciplinary action taken against Respondent and Defendants waited to conclude their investigation until Respondent was no longer enrolled at TTU.

## OBJECTIONS TO R&R

Under § 636(b)(1)(C) this Court must make a *de novo* determination of those portions of the report to which objection is made. Plaintiff thus submits these detailed objections to preserve matters for this Court's review as well as for subsequent review. As explained below, Plaintiff respectfully objects to the following:

1. certain factual findings and omissions of the R&R.

2. the R&R's conclusion that no exceptions to Eleventh Amendment Immunity are applicable to this case.

3. improper application of the Davis test in determining liability of Defendants under Title IX of the. Education Amendment Acts of 1972.

4. the R&R's conclusion that the allegations of Plaintiff's Second Amended Complaint do not demonstrate that the University was deliberately indifferent to Plaintiff's peer-assault and harassment.

5. certain conclusions of the R&R which are based on legal theories that contradict one another.

6. the R&R's conclusion and reasoning that Plaintiff cannot establish the requisite underlying constitutional violation to maintain her § 1983 individual capacity claims.

7. The R&R's recommendation that this Court should decline to exercise supplemental jurisdiction over her state claims.

## A. Plaintiff objects to certain factual findings and omissions

The R&R summarizes the University's response to Plaintiff's complaint without reference to the excessive amount of time that the University took to respond. The time frame associated with the University's investigation is a relevant fact and should be included in the findings of fact. The University's published Policy 143: Sexual Misconduct ("Policy 143"), states that, after receipt of a complaint alleging sexual misconduct:

*"Every reasonable effort shall be made to conclude the investigation and resolve the complaint within sixty (60) calendar days following receipt of the complaint. Within this sixty (60) day timeframe, absent good cause, it is expected that the investigator will conclude the investigation, that the investigator will present a report to the Vice President for Student Affairs (if the complainant and respondent are students) or the Vice President for Planning and Finance (if the complaint involved employees). The investigator will notify the parties in writing of the Vice President's determination."* See Policy 143 at 19.

To the best of Plaintiff's knowledge, the University did not even begin to investigate her complaint for more than 100 days after she filed it, when Defendant Hall notified Respondent of the allegations against him and issued a no-contact order. If the issuance of the no-contact order was not contingent on any prerequisite action, Defendants should have issued it immediately after becoming aware of Plaintiff's sexual assault.

In the R&R, the Magistrate Judge assumed that Plaintiff's description of "regular correspondence" with university officials indicated an active investigation, but that assumption

was based only the *occurrence of* communication, and it did not account for the content of those conversations. Plaintiff initiated the large majority of these conversations to inquire about the status of the investigation, but Defendants chose not to answer Plaintiff's questions or to provide information about the status of an investigation.

### B. Plaintiff objects to the R&R's conclusion that no exceptions to Eleventh Amendment Immunity are applicable to this case.

1) According to the Department of Justice, States do not have Eleventh Amendment Immunity under Title IX

In their "Title IX Manual", the Department of Justice writes:

> *"It is the position of the Department of Justice that Section 2000d-7 is an unambiguous abrogation which gives States express notice that a condition for receiving federal funds is the requirement that they consent to suit in federal court for alleged violations of Title IX and the other statutes enumerated".*

Similarly, the Department of Justice issued an updated "Title VI Legal Manual" in which it was clarified that:

> *"In 1986, Congress enacted 42 U.S.C. § 2000d-7 as part of the Rehabilitation Act Amendments of 1986, Pub. L. No. 99-506, Tit X §1003 State. 1845 (1986) to abrogate states' immunity from suit for violations of Sections 504, Title VI, Title IX, the Age Discrimination Act, and similar nondiscrimination Statutes".*

2) The Supreme Court has held that there are damages remedy for intentional discrimination is available under a Title IX private right of action.

In *Jackson v. Birmingham Bd. of Ed.,* the Supreme Court referred to its history of decisions regarding a private right of action under Title IX

> *More than 25 years ago, in Cannon v. University of Chicago, 441 U. S. 677, 690-693 (1979), we held that Title IX implies a private right of action to enforce its prohibition on intentional sex discrimination. In subsequent cases, we have defined the contours of that right of action. In Franklin v. Gwinnett County Public Schools, 503 U. S. 60 (1992), we held that it authorizes private parties to seek monetary damages for intentional violations of Title IX. We have also held that the private right of action encompasses intentional sex discrimination in the form*

*of a recipient's deliberate indifference to a teacher's sexual harassment of a student*, Gebser v. *Lago Vista Independent School Dist.,*524 U. S. 274, 290-291 (1998), *or to sexual harassment of a student by another student*, Davis v. *Monroe County Bd. of Ed.*, 526 U. S. 629, 642 (1999).

## C. Improper use of the Davis test in determining liability of Defendants under Title IX of the Education Amendment Acts of 1972.

The R&R concludes that Plaintiff's complaint does not allege sufficient facts to show that the University acted with deliberate indifference, in major part because Plaintiff did not allege that she was harassed or assaulted again after her initial report. The text of the R&R reads, in part:

> *The University cannot be deliberately indifferent to that of which it is unaware and would not reason to be aware. Accordingly, as far as the University was aware, the only incident of Plaintiff's averred peer-on-peer harassment was the off-campus sexual assault that set in motion the chain of events leading to the filing of this action".*

In Farmer v. Kansas State University, the court addressed the university's failure to respond to the plaintiff's sexual assault complaint, saying:

*"the courts that have directly addressed this issue have held that Davis requires that the funding recipient's deliberate indifference leave the student liable or vulnerable to further harassment, not that further harassment actually occur. Courts have consistently recognized that a student need not allege multiple instances of sexual assault to state a plausible Title IX claim." (Citing Kinsman v. Fla. State Univ. Bd. of Trs. 2015. And Karasek v. Regents of the Univ. of Cal.2015)*(internal quotations omitted).

## D. Plaintiff objects to the R&R's conclusion that the allegations of Plaintiff's Second Amended Complaint do not demonstrate that the University was deliberately indifferent to Plaintiff's peer-assault and harassment.

1. Plaintiff objects to the R&R's conclusions which are based on "the lack of allegations during this seven-month period". *See* R&R at 16.

Plaintiff argues that Defendants' deliberate indifference was evident within weeks of filing her complaint. Although the University continued to inadequately address Plaintiff's complaint between the dates of May 16, 2016 and January 11, 2017, Plaintiff's claims of deliberate indifference are not based exclusively on this period of time.

Plaintiff's Second Amended Complaint provides facts that are sufficient to satisfy the elements of a claim of deliberate indifference as defined by the Davis Test. According to the ruling in Davis, in order to establish a Title IX claim in a civil lawsuit against a university the claimant must prove four elements: (1) the school must be a Title IX funding recipient; (2) an "appropriate person" must have actual knowledge of the harassment the plaintiff alleges occurred; (3) the school must act with deliberate indifference to known acts of harassment in its programs or activities; and (4) the discrimination must be so severe, pervasive, and objectively offensive that it effectively bars access to an equal opportunity to education.

According to the R&R,

> *"In order to hold a funding recipient liable for damages under Title IX, a plaintiff must demonstrate that an appropriate person within the funding recipient had actual notice of the harassment and was deliberately indifferent to it."* Citing Gebser, 524 U.S. at 292-293. (internal quotations omitted). *See* R&R at 11.

The R&R also states that:

> *"Deliberate indifference occurs when an official who, at a minimum, has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf, has actual knowledge of the discrimination and fails to respond adequately."* Citing Gebser, 524 at U.S. 290. *See* R&R at 12.

It is undisputed that the University is a Title IX funding recipient, and thus satisfies the first element of the Davis Test. Plaintiff's Second Amended Complaint satisfies the second element of the Davis Test, which requires that an appropriate person be given actual notice of the harassment, and is further exemplified and explained in the following paragraphs. According to

Tennessee Tech Policy 143, in part, addresses the responsibilities of the Title IX Coordinator,

any appointed Investigator, University Counsel, Vice President of Student Affairs and the Dean

of Students. Excerpts from this policy include the following:

*"The Title IX Coordinator, in consultation with the appropriate Cabinet members, may designate deputies and investigators ("designees") to assist in carrying out any of the responsibilities related to implementing this policy*. See Policy 143 at 16.

*"All complaints of sexual misconduct shall be presented to the Title IX Coordinator or designee for investigation and appropriate disposition." Id.*

*"After consultation with University Counsel, if the Title IX Coordinator determines that the complaint contains an allegation of sexual misconduct, the Title IX Coordinator shall follow the procedures set forth in this policy to investigate and adjudicate the complaint." Id.,* at 17.

*"If a final decision has been made that a policy violation occurred, the respondent shall be referred to the appropriate personnel for a determination of discipline. The appropriate personal will be determined by the status of the respondent. For example, if the respondent is a student, the matter may be referred to the student conduct officer" Id.,* at 21.

Plaintiff personally spoke to Defendant Hall (Title IX Coordinator) and Defendant

Owens (Title IX Investigator) about her assault, and Plaintiff has records of emails in which

Defendant Carpenter (University Counsel), and Defendant Burnett (Vice President of Student

Affairs) were also notified of her sexual assault and that Defendant Burnett was advised to

forward the information on to the Office of the Dean of Student. Therefore, it is indisputable that

at least four University employees were given actual notice of the complaint at that each of these

Defendants had the authority to address the complaint and to institute corrective measures on

Plaintiff's behalf.[1]

---

1.    It is unclear, at this junction, whether Mr. Burnett actually forwarded the Investigative Memorandum to the Office of the Dean of Students, therefore Defendant Williams is not counted among the employees that were indisputably given actual notice.

The third element of the Davis test, which states that the school must have been deliberately indifference to Plaintiff's complaint, is demonstrable by review of communications among Plaintiff, Plaintiff's former attorney, and Defendants, and is exemplified by the excessive and unexplained amount of time that the University took to investigate Plaintiff's complaint.

In addition to the timeline, Defendants' repeated refusals to conduct a timely investigation or to update the Plaintiff as to the status of any such investigation can be inferred from email exchanges, such as the following:

On January 19, 2016, Plaintiff emailed Defendant Hall, writing

*"If it's starting to look like we won't be able to proceed, for whatever reason, I'd rather know now than in the middle of the semester".*

On February 10, 2016, Plaintiff emailed Defendant Hall, writing

*You are probably tired of having to constantly reassure me, but I have to do what is best for me and if there is a reason to believe that this investigation won't ever happen, I'd rather know now than find out in the middle of the semester".*

On May 2, 2016, Plaintiff's former attorney, Mr. Alex Little, wrote to Defendant Hall on Plaintiff's behalf to request that TTU provide "an immediate update" regarding the status of the investigation. On May 6, 2016, University Counsel, Defendant Carpenter sent an email to Mr. Little in which she refused to provide an update about the investigation.

The correspondences described above are specific instances in which Defendants were asked for information or explanation regarding a timeline for the initiation and/or conclusion of an administrative investigation and declined to provide information. Given that the complaint was based on a report that Plaintiff was raped by a fellow student, this response was clearly inadequate and unreasonable.

Finally, the fourth element of the Davis Test is that the harassment must be so severe, pervasive, and objectively offensive that it effectively bars access to an equal opportunity to education. Courts have addressed the issue of the severity of sexual assault as a form of harassment. In Kelly v. Yale, the Court directly addresses this severity element of the Davis test, stating that

*"There is no question that a sexual assault... constitutes severe and objectively offensive sexual harassment"* See Kelly v. Yale, 2003.

Deliberate indifference means that the defendant's response or lack of response to the alleged harassment was clearly unreasonable in light of the known circumstances. In *Hyut v. State University of New York*, the Second Circuit acknowledged that

*"Deliberate indifference may be found both where the defendant's response is unreasonable in light of the known circumstances and when the remedial action only follows after a lengthy and unjustifiable delay."*

Through the circumstances described above, Plaintiff has demonstrated that there are actual facts to indicate that Defendants' acted unlawfully and therefore her complaint should not be dismissed.

### E. Plaintiff objects to the reasoning given for dismissal of her § 1983 claims and her Title IX claims because they rely on legal theories that are mutually exclusive.

The R&R recommends dismissal of Plaintiff's § 1983 claims against Defendants in their official capacities on the grounds that

*"[a]n official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which the agent represents"* and that *"As such, when a public employee is sued in his or her official capacity the claims are essentially made against the public entity".* and that *"Eleventh Amendment immunity protects states, as well as state officials in their official capacities for being sued in federal court for money damages".*

If defendants are considered to be a public entity for the purposes of avoiding liability under § 1983, then they must also be considered a public entity for the purposes of determining liability under Title IX. The R&R recommends dismissal of Plaintiff's Title IX claims against Defendants' in their individual capacities by reasoning that "Title IX applies to recipients of federal funds" and concludes that "Because the individual Defendants are not themselves recipients of federal funds, they cannot be held liable". *See IR&R at 11.*

If defendants are considered to be a public entity and, under this consideration, attempt to exercise immunity granted to state institutions, then they must also identify as recipients of benefits granted to those institutions. Consequently, if considered a public entity, Defendants were, in fact, recipients and federal funding and therefore can be held liable under Title IX. The corollary to the contradiction described above is that, if Defendants are able to avoid liability under Title IX by claiming that as individuals, they are not recipients of federal funds, then they must also be considered individuals for the purposes of determining liability for violations of §1983.

**F. The R&R's conclusion and reasoning that Plaintiff cannot establish the requisite underlying constitutional violation to maintain her § 1983 individual capacity claims.**

As explained previously, Defendants knowingly and repeatedly refused to follow their published procedures to respond to Plaintiff's complaint of student-on-student sexual assault. Defendant's had a duty, as described by their own policies, to provide Plaintiff with interim measures to help Protect her ability to her continue to pursue her education on campus, in spite of the fact that she was constantly fearful that she would encounter her attacker on campus. The individual Defendants reasonably should have known that Plaintiff would be effectively unable to freely

access the resources available through the school. Furthermore, Defendants actually knew that Plaintiff had paid the University tuition with the expectation that she would not be precluded from accessing university resources for reasons outside her control. Defendants' unreasonable response to Plaintiff's complaint deprived her of a property interest, in the form of benefits offered by the school, a liberty interest in her ability to acquire useful knowledge, and a reputational interest in the form of damage to her GPA that will likely affect her ability to find employment. Policy 143 states that

> *"If the investigator or Vice President determines that additional time is needed, both parties shall be notified in writing of the delay, the anticipated date that the investigation will be concluded, and reasons for such delay."*

In the 16 months between Plaintiff's November 12 meeting with Defendant Hall and TTU's release of the Investigative Memorandum to Plaintiff, she was never provided notification to explain the delay and was never provided an anticipated date that the investigation would be concluded. Policy 143 also addresses some measures that TTU employees can take while investigating a complaint. The text of Policy 143 reads, in part:

> *In situations that require immediate action because of safety or other concerns, Tennessee Tech will take any reasonable administrative action that is appropriate. Examples of such interim actions include, but are not limited to:*
> 1. *Providing an escort to ensure that the complainant can move safely between classes and activities*
> 2. *Provide academic support services, such as tutoring*
> 3. *Arranging for the complainant to retake a course or withdraw from a class without penalty, include ensuring that any changes do not adversely affect complainant's academic record. Id at 22-23.*

If Defendants' response had been consistent with the procedures in Policy 143, any of the Individual Defendants could have notified Plaintiff of interim measures available, and Plaintiff could have chosen to withdraw from her courses without penalty. Plaintiff sent several emails to Defendant Hall during November and December 2015 to assure Ms. Hall that Plaintiff wanted to

be cooperative and helpful, and specifically that she was working on a written statement to submit, but also expressed that this process was interfering with her studies.

On December 4, 2015, Plaintiff wrote to Defendant Hall, saying:

> *"Ms. Hall, I am trying to get done writing this statement but also make a last effort to pass most/maybe all of my classes. Is this something you are going to need to read? It's already three pages and I'm not done. I'm guessing it's too late to drop any classes, right?"*

On December 13, 2015, Plaintiff wrote to Defend Hall, saying:

*"I attempted to contact one of my professors about my grade by email. He never emailed me back and posted it as an F on Tech's online student portal. That class would have been a prerequisite for several others."*

Although Defendant Hall mentioned the term "academic accommodations" occasionally in response to Plaintiff's complaints of being unable to keep up in her classes, Defendant Hall did not specify what such accommodations might include and certainly did not inform Plaintiff that she could" retake a course or withdraw from a class without penalty, include ensuring that any changes do not adversely affect complainant's academic record.". *See* Policy 143 at 22. Ultimately, Plaintiff did fail one of the classes most fundamental to her major, and had to retake it the next semester (this grade was later changed to a "D" after Plaintiff's advisor intervened on her behalf, but she had to retake the course nonetheless). This set her graduation date back a semester and left a permanent record on her transcript.

In addition to deviating extensively from the procedures in Policy 143, Defendants' deprived Plaintiff of equal treatment under the law. Plaintiff was interviewed twice by Defendants', at least once by herself, whereas Respondent had his attorney present for all meetings with Defendant. Defendant Hall also strongly and persistently encouraged Plaintiff to submit a written account of her complaint, which Plaintiff wrote and submitted in a timely

manner. However, to the best of Plaintiff's knowledge, Respondent did not submit anything in writing to Defendant Hall or any other university employee to record his account of the assault.

Defendants' failure to abide by the procedures, as described in Policy 143, deprived Plaintiff of the property interests, liberty interest, and reputational interests described above. Plaintiff has records of email exchanges in which she discusses her declining academic performance, and the imminent threat that this posed to her ability to obtain the degree she sought, but Defendant Hall did not assist Plaintiff or offer any of the interim measures previously mentioned.

## G. The R&R's recommendation that this Court should decline to exercise supplemental jurisdiction over her state claims.

Plaintiff, at this stage of the proceedings, has sufficiently alleged facts that indicate that Defendants' acted unlawfully and states a claim upon which relief can be granted. Since Plaintiff has set forth sufficient facts, with respect to her claims under Title IX and her claims under U.S.C. *§ 1983,* to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), this Court should also exercise its jurisdiction to Plaintiff's State Law Claims.

As a final note, Plaintiff filed a reply to Defendants' Motion to Dismiss, in which she provided additional details to support the claims in her Second Amended Complaint. The information in Plaintiff's reply gave further examples of the sexually hostile nature of the educational environment, and detailed an additional level of discrimination associated with her dual status as a student and employee of the University at times relevant to this action. Defendants' filed a sur-reply in which they argued that the information contained in Plaintiff's reply could not be used for the purposes of considering the Motion to Dismiss. Plaintiff respectfully requests that, if this Court chooses to grant Defendants' Motion to Dismiss, that this

Court also grant Plaintiff Leave to Amend so that she can refile her complaint to include the information which was presented in her Reply to Defendants' Motion to Dismiss.

## CONCLUSION

Plaintiff's Second Amended Complaint alleged sufficient facts to indicate that there is a mere possibility that Defendants acted unlawfully and Defendants' Motion to Dismiss should not be granted. The general standard used for determining liability for an inadequate response by a university to student sexual harassment relies largely on whether the action taken by the university was unreasonable in light of the known circumstances. Defendants knew that Plaintiff reported that she had been raped by another TTU student, that Plaintiff was suffering emotional and cognitive impairments as a result, and that Plaintiff was effectively unable to freely access resources offered by the University, and yet Defendants failed to initiate an investigation for 100 days after Plaintiff filed her complaint and did not conclude the investigation until Respondent had already left the University. This response was clearly unreasonable in light of the known circumstances and Plaintiff has sufficiently alleged facts that support her claims. For the reasons stated in this document, Defendants' Motion to Dismiss should be dismissed.

Respectfully Submitted this 5th Day of September, 2018

Sarah Beth Cain

Plaintiff

9/5/18
_____

(Date)

*Sarah Beth C.*

(Signature)

_Sarah Beth Cain_

(Printed Name)


_500 Dry Valley Rd._
_Apt. E306_
_Cookeville, TN 38506_
_(615) 485-3459_

(Address and Telephone Number)

Tennessee Technological University
Policy No. 143

# Sexual Misconduct

*Effective Date: July 1, 2015*

Policy No.: 143
Policy Name: Sexual Misconduct
Policy Subject: Policy and procedures related to allegations of incidents of domestic violence, dating violence, sexual assault, and stalking
Effective Date: July 1, 2015

## I. Purpose

This policy is intended to provide a single, easily accessible and user-friendly document for students, employees and others affected by sexual misconduct to find information regarding Tennessee Tech's rules and procedures related to the offenses defined herein.

## II. Scope

A. These procedures shall be utilized by:

1. Any employee or student who has been a victim of sexual misconduct, regardless of sexual orientation or gender identity/expression;

2. Former employees or students if the conduct took place during the time of employment or enrollment at Tennessee Tech and the conduct has a reasonable connection to the institution; and

3. All third parties with whom Tennessee Tech has an educational or business relationship and the conduct has a reasonable connection to the institution.

B. This policy is adopted specifically to address the offenses defined herein. All other forms of sex discrimination including sexual harassment are also strictly prohibited. Allegations that are not within the scope of this policy are subject to the procedures described in TBR Guideline P-080 as adopted and implemented by Tennessee Tech Policy 141.

## III. Review

This policy will be reviewed every four years or whenever circumstances require review, whichever is earlier, by the Title IX Coordinator in consultation with the Vice Presidents for Planning and Finance and Student Affairs with recommendations for revision presented to the Administrative Council and University Assembly.

## IV. Definitions

A. Consent – an informed decision, freely given, made through mutually understandable words or actions that indicate a willingness to participate in mutually agreed upon sexual activity. Consent cannot be given by an individual who is asleep; unconscious; or mentally or physically incapacitated, either through the effect of drugs or alcohol or for any other reason; or, is under duress, threat, coercion, or force. Past consent does not imply future consent. Silence or

1

an absence of resistance does not imply consent. Consent can be withdrawn at any time.

B. Dating Violence – violence against a person when the accuser and accused are dating, or who have dated, or who have or had a sexual relationship. "Dating" and "dated" do not include fraternization between two (2) individuals solely in a business or non-romantic social context. Violence includes, but is not necessarily limited to:

1. Inflicting, or attempting to inflict, physical injury on the accuser by other than accidental means;

2. Placing the accuser in fear of physical harm;

3. Physical restraint;

4. Malicious damage to the personal property of the accuser, including inflicting, or attempting to inflict, physical injury on any animal owned, possessed, leased, kept, or held by the accuser; or

5. Placing a victim in fear of physical harm to any animal owned, possessed, leased, kept, or held by the accuser. TCA § 36-3-601(5)(c)

C. Domestic Violence – violence against a person when the accuser and accused:

1. Are current or former spouses;

2. Live together or have lived together;

3. Are related by blood or adoption;

4. Are related or were formally related by marriage; or

5. Are adult or minor children of a person in a relationship described above.

Domestic violence includes, but is not necessarily limited to, the following:

1. Inflicting, or attempting to inflict, physical injury on the accuser by other than accidental means;

2. Placing the accuser in fear of physical harm;

3. Physical restraint;

2

4.  Malicious damage to the personal property of the accuser, including inflicting, or attempting to inflict, physical injury on any animal owned, possessed, leased, kept, or held by the accuser; or

5.  Placing the accuser in fear of physical harm to any animal owned, possessed, leased, kept, or held by the accuser. TCA § 36-3-601

D.  Responsible Employee – a Tennessee Tech employee who has the authority to redress sexual misconduct, who has the duty to report incidents of sexual misconduct, or whom a student could reasonably believe has this authority or duty.

E.  Sexual Assault – the nonconsensual sexual contact with the accuser by the accused, or the accused by the accuser when force or coercion is used to accomplish the act, the sexual contact is accomplished without consent of the accuser, and the accused knows or has reason to know at the time of the contact that the accuser did not or could not consent. Sexual contact includes, but is not limited to, the intentional touching of the accuser's, the accused's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the accuser's, the accused's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.

F.  Sexual Misconduct – for the purposes of this policy, "sexual misconduct" is defined as domestic violence, dating violence, sexual assault, and stalking.

G.  Stalking – a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the accuser to feel terrorized, frightened, intimidated, threatened, harassed, or molested. Harassment means conduct directed toward the accuser that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable person to suffer emotional distress, and that actually causes the accuser to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose. TCA § 39-17-315

V.  **Policy**

Tennessee Tech intends to comply fully with Title IX of the Education Amendments of 1972, Section 485(f) of the HEA, as amended by Section 304 of the Violence Against Women Reauthorization Act of 2013, the regulations implementing these Acts found at 34 CFR § 668.41, §668.46, and Appendix A to Subpart D of Part 668. Sexual misconduct is a form of sex discrimination prohibited by Title IX and Tennessee Tech.

3

## VI.  Immediate Steps a Victim Should Take

A. In the immediate aftermath of a sexual assault, domestic violence, dating violence or similar event, the most important thing is for the victim to get to a safe place and to call 911 if in immediate danger.

B. When a feeling of safety has been achieved, the victim should seek medical attention, regardless of his or her decision to report the crime to the police. It is very important for the victim of sexual assault to seek medical attention immediately so that the victim can be screened for sexually transmitted diseases/pregnancy/date rape drugs, obtain emergency contraception, and receive treatment for any physical injuries.

C. Victims have the right to accept or decline any or all parts of a medical exam. However, critical evidence may be lost or missed if not collected or analyzed.

D. Valuable physical evidence can be obtained from the victim and the victim's clothing. Victims should make every effort to save anything that might contain the perpetrator's DNA. Therefore, if at all possible, a victim should not:

1. Bathe or shower;

2. Wash his or her hands;

3. Brush his or her teeth;

4. Use the restroom;

5. Change clothes;

6. Comb hair;

7. Clean up, move things, or change anything associated with the crime scene; or

8. Move anything the offender may have touched.

E. Even if the victim has not yet decided to report the crime, receiving a forensic medical exam and keeping the evidence safe from damage will improve the chances that the police can access and test the stored evidence if the victim chooses to prosecute at a later date.

F. Victims of sexual misconduct are encouraged to preserve evidence by saving text messages, instant messages, social networking pages, other communications, and keeping pictures, logs or other copies of documents, if they have any, that would be useful to investigators.

4

G. A list of additional resources may be found here.

VII. **Confidentiality Considerations**

A. Tennessee Tech encourages victims of sexual misconduct to talk to somebody about what happened so they can get the support they need and so Tennessee Tech can respond appropriately. Though Tennessee Tech will keep reports as confidential as possible, it cannot guarantee the confidentiality of every report or complaint. The following provisions detail the confidentiality options available to individuals.

B. **Reports to Tennessee Tech professional licensed counselors are confidential in every respect to the extent allowed by law**

1. Professional licensed counselors who provide mental-health counseling to members of Tennessee Tech's community (and including those who act in that role under the supervision of a licensed counselor) are not required to report any information about an incident to the Title IX Coordinator and will not do so without a victim's written permission.

2. **Contact information for professional licensed counselors who offer their services through Tennessee Tech**

| DEPARTMENT | LOCATION | WEBSITE |
|---|---|---|
| (DURING business hours - Monday – Friday, 8:00 am - 4:30 pm)<br><br>TTU Counseling Center | TTU, Roaden University Center, Rm. 307 | 931-372-3331<br><br>https://www.tntech.edu/studentaffairs/counsel/ |
| (AFTER business hours)<br><br>TTU Counseling Center | TTU, Roaden University Center, Rm. 307 (closed after business hours but can be reached through TTU Police) | Option #1: Call 911 and ask TTU Police to contact counselor on call.<br><br>Option #2: Go to nearest hospital ER.<br><br>https://www.tntech.edu/studentaffairs/counsel/ |
| (Available 24/7)<br><br>Employee Assistance Program (EAP) | | 855-HERE4TN (437-3486) or 615-741-1925<br><br>https://www.tntech.edu/planning-and-finance/hr/benefits/current- |

5

| | | employee/eap/ or http://tennessee.gov/finance/ ins/eap.shtml, or www.magellanhealth.com |
|---|---|---|

3. Professional licensed counselors will maintain confidentiality of any such reports unless required by law or court order to disclose the information. For example, Tennessee's mandatory reporting law related to abuse of minors, imminent harm to others, or subpoenas for testimony may require disclosure of all information received.

4. If the employees or volunteers identified in this section determine that there is imminent threat to others and Tennessee Tech determines that the alleged perpetrator(s) pose a serious and immediate threat to the Tennessee Tech community, Tennessee Tech may be called upon to issue a timely warning to the community. Any such warning will not include any information that identifies the victim.

5. A victim who speaks to a professional licensed counselor must understand that, if the victim wants to maintain confidentiality, Tennessee Tech will be unable to conduct an investigation into the particular incident or pursue disciplinary action against the alleged perpetrator(s).

6. Professional licensed counselors will assist the victim in receiving other necessary protection and support, such as victim advocacy, academic support or accommodations, disability, health or mental health services, and changes to living, working or course schedules.

7. In some cases, providing requested assistance might require the professional licensed counselor to reveal identifying information to other individuals.

8. Professional licensed counselors must receive written permission from the victim to reveal the minimum information necessary to arrange requested assistance.

9. Upon receipt of written permission to disclose confidential information to Tennessee Tech, professional licensed counselors must contact the Title IX Coordinator and the University Police if a victim decides to file a complaint with Tennessee Tech or report the incident to local law enforcement.

C. **Reports to non-professional counselors and advocates are confidential as to name and other identifying information and to the extent allowed by law**

1. Individuals who work or volunteer in the on-campus Women's Center, Health Services, other Tennessee Tech health professionals acting as such, and SANE nurses, including front desk staff and students, can generally talk to a victim

6

without revealing any personally identifying information about an incident to Tennessee Tech's Title IX Coordinator.

2. A victim can seek assistance and support from the offices identified in this section without triggering an investigation that could reveal the victim's identity or that the victim has disclosed the incident.

3. While maintaining a victim's confidentiality, these individuals or their office must report the nature, date, time, and general location of an incident to the Title IX Coordinator. This limited report shall not include information that would directly or indirectly identify the victim.

4. Before reporting any information to the Title IX Coordinator, these individuals will consult with the victim to ensure that no personally identifying details are shared with the Title IX Coordinator.

5. **CONTACT INFORMATION**

| TTU Health Services | TTU, Bell Hall/Nursing Bldg., Rm. 100 | 931-372-3320 https://www.tntech.edu/ studentaffairs/healthserv ices/ |
| --- | --- | --- |
| TTU Women's Center | TTU, Pennebaker Hall, Rm. 203 | 931-372-3850 https://www.tntech.edu/ women/ |
| TTU SANE (Sexual Assault Nurse Examiner) – Sensitive medical evidence exams for sexual assault victims provided by SANE-certified Nursing faculty members | On-call status | Call TTU Health Services (931-372-3320) or TTU Police (911), who, in turn, will notify a SANE RN of the urgency. |

6. Employees and volunteers in the offices identified in this section will maintain confidentiality of any information that could directly or indirectly identify the victim unless required by law, rule, or court order to disclose the information. For example, Tennessee's mandatory reporting law related to abuse of minors, imminent harm to others, or subpoenas for testimony may require disclosure of all information received.

7. If the employees or volunteers identified in this section determine that there is imminent threat to others and Tennessee Tech determines that the alleged

7

perpetrator(s) pose a serious and immediate threat to the Tennessee Tech community, Tennessee Tech may be called upon to issue a timely warning to the community. Any such warning will not include any information that identifies the victim.

8. A victim who speaks to an individual covered by this section must understand that, if the victim wants to maintain confidentiality, Tennessee Tech may be unable to conduct an investigation into the particular incident or pursue disciplinary action against the alleged perpetrator.

9. Individuals covered by this section will assist the victim in receiving other necessary protection and support, such as victim advocacy, academic support or accommodations, disability, health or mental health services, and changes to living, working or course schedules.

10. In some cases, providing requested assistance might require the individuals covered by this section to reveal identifying information to other individuals.

11. Individuals covered by this section must receive written permission from the victim to reveal the minimum information necessary to arrange requested assistance.

12. Upon receipt of written permission to disclose confidential information to Tennessee Tech, individual covered by this section must contact the Title IX Coordinator and the University Police if a victim decides to file a complaint with Tennessee Tech or report the incident to local law enforcement

**D. Reports to off-campus counselors and advocates may be confidential to the extent allowed by law**

1. Off-campus counselors, advocates, and health care providers will also generally maintain confidentiality and not share information with Tennessee Tech unless the victim requests the disclosure and signs a consent or waiver form.

2. Following is contact information for these off-campus resources:

| Cookeville Regional Medical Center | Emergency: 911 Non-emergency: 931-528-2541 | 10 E. Broad St., Cookeville, TN 38501 | www.cookevillepolice.com |
| Cookeville Ambulance Service | Emergency: 911 Non-emergency: 931-528-1555 | 701 County Services Dr., Cookeville, TN 38501 | www.putnamems.org |
| Genesis House - Has local office and domestic shelter; also on-site victim advocacy | Hotline: 931-526-5197 or 800-707 - 5197 | PO Box 1180, Cookeville, TN 38503 | www.genesishouseinc.com/ |

8

| for emergencies | | | |
|---|---|---|---|
| Sexual Assault Center | Crisis & Support Line 1-800-879-1999 | 101 French Landing Dr., Nashville, TN 37228 | http://www.sacenter.org/ |
| TCADSV (TN Coalition Against Domestic and Sexual Violence) | Statewide Domestic Violence and Child Abuse Hotline: 800-356-6767 | 2 International Plaza Drive, Suite 425, Nashville, TN 37212 | www.tcadsv.org |
| TCEDSV (TN Coalition to End Domestic & Sexual Violence) | 615-386-9406 | 2 International Plaza Drive, Suite 425, Nashville, TN 37212 | tncoalition.org |
| Americans Overseas Domestic Violence Crisis Center | Hotline: 866-USWOMEN (879-6636) | PO Box 25007 Portland, OR 97298 | http://www.866uswomen.org/ |
| Disaster Distress Helpline (for those suffering from stress in reaction to natural or manmade disaster) | Hotline: 800-985-5990 | Substance Abuse & Mental Health Services Administration, 1 Choke Cherry Rd, Rockville, MD 20857 | http://www.disasterdistress.samhsa.gov/ |
| GLBTQ Domestic Violence Project | Hotline: 800-832-1901 | 955 Massachusetts Avenue, PMB 131 Cambridge, MA 02139 | http://www.glbtqdvp.org/ |
| LGBTQ Trevor Lifeline | Hotline: 866-488-7386 | 8704 Santa Monica Blvd, Suite #200, West Hollywood, CA 90069 | http://www.thetrevorproject.org/ |
| Love Is Respect | Hotline: 866-331-9474 or (TTY) 866-331-8453 | | http://www.loveisrespect.org/ <br><br> NOTE: You can also text "campus", "loveis" or "HELP" to 22522 for support. Msg & Data Rates apply on text for help services. |
| Mobile Crisis Response Team | National Hotline: 855-CRISIS-1 or 855-274-7471 | | http://www.recoverywithinreach.org/treatment/consumerrights/mobilecrisis or http://tn.gov/mental/recovery/crisis_serv.shtml |

9

| National Domestic Violence Hotline | Hotline: 800-799-SAFE (7233) or (TTY) 800-787-3224 | PO Box 161810, Austin, TX 78716 | http://www.thehotline.org/ |
|---|---|---|---|
| National Sexual Assault Hotline | See RAINN for hotline number. | See contact information for RAINN. | See contact information for RAINN. |
| National Suicide Prevention Lifeline | Hotline: (English) 800-273-TALK (8255) (Spanish) 888-628-9454 ) (TTY) 800-799-4889 | TN Suicide Prevention Network, 295 Plus Park Blvd, Suite #201, Nashville, TN 37217 | http://tspn.org/i-need-help-now or http://www.suicideprevention lifeline.org/ |
| Overseas Citizens Services | (from US or Canada) 888-407-4747 or (from overseas) +1-202-501-4444 | To locate a US consulate or embassy, go to http://www.usembassy.gov/ | http://travel.state.gov/content/passports/english/emergencies.html and/or http://travel.state.gov/content/passports/english/emergencies/victims.html |
| RAINN (Rape, Abuse & Incest National Network) | Hotline: 800) 656-HOPE (4673) | 1220 L Street, NW Suite 505 Washington, DC 20005 | www.rainn.org |
| SAMHSA's National Helpline (for mental health issues and/or substance use/abuse) | Hotline: 800-662-HELP (4357) (in English or Spanish) or (TTY) 800-487-4889 | Substance Abuse & Mental Health Services Administration, 1 Choke Cherry Rd, Rockville, MD 20857 | http://beta.samhsa.gov/find-help |
| Veteran's Crisis Line (for veterans in crisis as well as for their families and friends) | Hotline: 800-273-8255 or (TTY) 800-799-4889 | Substance Abuse & Mental Health Services Administration, 1 Choke Cherry Rd, Rockville, MD 20857 | http://beta.samhsa.gov/find-help |

3.  While these off-campus counselors and advocates may maintain a victim's confidentiality vis-à-vis Tennessee Tech, victims should discuss concerns related to the limits of confidentiality with the off-campus counselors, advocates and health care providers. Those individuals may have reporting or other obligations under state law such as reporting under Tennessee's mandatory reporting law related to abuse of minors, imminent harm to others, or subpoenas for testimony that may require disclosure of information received.

**E. Reports to responsible employees may not be confidential but will be handled in as confidential a manner as possible**

1. When a complainant tells a responsible employee about an incident of sexual misconduct, Tennessee Tech will take immediate and appropriate steps to investigate what happened and to resolve the matter promptly and equitably.

2. A responsible employee must report to the Title IX Coordinator all relevant details about the alleged sexual misconduct.

3. To the extent possible, information reported to a responsible employee will be shared only with people responsible for handling Tennessee Tech's response to the report.

4. A responsible employee shall not share information with law enforcement without the complainant's consent or unless the victim has also reported the incident to law enforcement.

5. Employees in the following list are Tennessee Tech's designated responsible employees:

   a. Supervisors (administrative and faculty);

   b. All faculty (permanent, temporary, adjunct, etc.);

   c. Advisors for academic matters or student organizations;

   d. Teaching assistants;

   e. Graduate assistants;

   f. Resident advisors;

   g. Title IX Coordinator and designees;

   h. University Police;

   i. Campus Security Authorities unless they fall within the terms of Section VII.C; and

   j. Other positions as designated by the Vice President or Director of the unit.

6. Before a complainant reveals any information to a responsible employee, the employee must ensure that the complainant understands the employee's reporting obligations.

7. If the complainant wants to maintain confidentiality, the responsible employee must direct the victim to confidential resources.

8. If the complainant wants to tell the responsible employee what happened but also maintain confidentiality, the employee must advise the complainant that Tennessee Tech will consider the request, but cannot guarantee that it will be able to honor it. In reporting the details of the incident to the Title IX Coordinator, the responsible employee will also inform the Coordinator of the complainant's request for confidentiality.

9. Responsible employees will not pressure a complainant to request confidentiality, but will honor and support the complainant's wishes, including for Tennessee Tech to fully investigate an incident. By the same token, responsible employees will not pressure a complainant to make a full report if the complainant is not ready to do so.

10. All reports of sexual misconduct made to University Police will automatically be referred to the Title IX Coordinator for review and investigation, if appropriate, even if the complainant declines to pursue criminal charges.

11. Reporting to University Police (Nottingham Act requirements under Tennessee State law)

a. Unless a rape victim does not consent to the reporting of an offense, the University Police shall immediately notify the local law enforcement agency with territorial jurisdiction over Tennessee Tech if the officer is in receipt of a report from the victim alleging that any degree of rape has occurred on Tennessee Tech's property. The chief security officer or chief law enforcement officer shall designate one (1) or more persons who shall have the authority and duty to notify the appropriate law enforcement agency in the absence of the chief security officer or chief law enforcement officer. Upon notification, it shall be the duty of each law enforcement agency to participate in a joint investigation. In the case of an alleged rape, Tennessee Tech's University Police shall lead the investigation. After notifying the local law enforcement agency, Tennessee Tech will cooperate in every respect with the investigation conducted by the law enforcement agency. T.C.A. § 49-7-129.

b. If the victim does not consent to the reporting, Tennessee Tech's chief security officer or chief law enforcement officer shall not report the offense to the local law enforcement agency. T.C.A. § 49-7-2207; Public Acts 2005, Chapter 305.

F. Reports that are not considered "notice"

1. Public awareness events such as "Take Back the Night," the Clothesline Project, candlelight vigils, protests, "survivor speak outs" or other forums, including social media and class discussions, in which students disclose incidents of sexual

12

misconduct are not considered notice to Tennessee Tech of sexual misconduct for purposes of triggering its obligation to investigate any particular incident(s).

2. Such events may, however, inform the need for campus-wide education and prevention efforts, and Tennessee Tech will provide information about students' Title IX rights at these events or during the forum.

**G. How Tennessee Tech will weigh a request for confidentiality**

1. If a complainant discloses an incident to a responsible employee but wishes to maintain confidentiality or requests that no investigation into a particular incident be conducted or disciplinary action taken, Tennessee Tech will weigh that request against the its obligation to provide a safe, non-discriminatory environment for all students, including the complainant.

2. If Tennessee Tech honors the request for confidentiality, the complainant should understand that Tennessee Tech's ability to meaningfully investigate the incident and pursue disciplinary action against the alleged perpetrator(s) may be limited.

3. In some cases, Tennessee Tech may not be able to honor a complainant's request in order to provide a safe, non-discriminatory environment for all students.

4. Tennessee Tech's Title IX Coordinator will evaluate requests for confidentiality once a responsible employee is on notice of alleged sexual misconduct.

5. When weighing a complainant's request for confidentiality or that no investigation or discipline be pursued, the Title IX Coordinator will consider a range of factors, including the increased risk that the alleged perpetrator will commit additional acts of sexual or other misconduct, such as:

a. Whether there have been other sexual misconduct complaints about the same alleged perpetrator;

b. Whether the alleged perpetrator has a history of arrests or records from a prior school indicating a history of misconduct;

c. Whether the alleged perpetrator threatened further sexual misconduct or other misconduct against the complainant or others;

d. Whether the sexual misconduct was committed by multiple perpetrators;

e. Whether the sexual misconduct was perpetrated with a weapon;

f. Whether the victim is a minor;

g. Whether Tennessee Tech possesses other means to obtain relevant evidence of the

13

sexual misconduct (e.g., security cameras or personnel, physical evidence); or

    h. Whether the complainant's report reveals a pattern of perpetration (e.g., via illicit use of drugs or alcohol) at a given location or by a particular group.

6. The presence of one or more of these factors could lead Tennessee Tech to investigate and, if appropriate, pursue disciplinary actions.

7. If none of these factors is present, Tennessee Tech will likely respect the complainant's request for confidentiality.

8. If Tennessee Tech determines that it cannot maintain a complainant's confidentiality, Tennessee Tech will inform the complainant prior to starting an investigation and will, to the extent possible, only share information with people responsible for handling Tennessee Tech's response.

9. Tennessee Tech will not require a complainant to participate in any investigation or disciplinary proceeding.

## VIII. Tennessee Tech's Response to a Report of Sexual Misconduct

A. Tennessee Tech will take ongoing steps to protect the complainant from retaliation or harm and work with the complainant to create a safety plan. Retaliation, as defined by applicable law, against the complainant, whether by students or Tennessee Tech employees, will not be tolerated.

B. After appropriate consideration of confidentiality requirements and to the extent reasonable, Tennessee Tech will:

1. Assist the complainant in accessing other available victim advocacy, academic support, counseling, disability, health or mental health services, and legal assistance both on and off campus (see Section XIV below for more information on interim measures);

2. Provide other security and support, which could include issuing a no-contact order, helping arrange a change of living or working arrangements or course schedules (including for the alleged perpetrator pending the outcome of an investigation) or adjustments for assignments or tests; and

3. Inform the complainant of the right to report a crime to campus or local law enforcement and provide assistance if the complainant wishes to do so.

C. While respecting the limits of confidentiality, the Title IX Coordinator will review reports to determine if broader remedial action is required; such broader remedial action may include but is not limited to increased monitoring, supervision or security at locations where the reported sexual misconduct occurred, increased

14

education and prevention efforts, including to targeted population groups, conducting climate assessments/victimization surveys, and/or revisiting its policies and practices.

IX.    **Role of Title IX Coordinator**

A. Tennessee Tech's Title IX Coordinator is responsible for overseeing all Title IX incidents reported to Tennessee Tech and for the implementation of this policy, including but not limited to identifying and addressing any systemic gender-based harassment, discrimination, and sexual misconduct. The Title IX Coordinator's responsibilities include, but are not limited to:

1. Investigation or oversight of investigations of allegations related to Title IX;

2. Coordination and oversight of educational programs including mandatory training for new students and employees and awareness campaigns for current students and employees;

3. Coordination with University Police and local law enforcement on matters related to allegations related to sexual misconduct;

4. Coordination and oversight of training for law enforcement, responsible employees, victim advocates, and anyone else involved in responding to, investigating, or adjudicating sexual misconduct;

5. Coordination and oversight of training for employees likely to witness or receive reports of sexual misconduct, including professors, school law enforcement, school administrators, school counselors, general counsels, athletic coaches, health personnel and resident advisors;

6. Coordination and oversight of training for responsible employees related to appropriately responding to reports of sexual misconduct and the obligation to report sexual misconduct to the Title IX Coordinator or other designated official;

7. Coordination and oversight of training for professional counselors and individuals covered by Section VII.C. relating to the extent to which they may keep a report confidential;

8. Coordination and oversight of annual training for investigators, decision makers, hearing officers and hearing committee members on the issues related to sexual misconduct and on how to conduct an investigation and hearing process that protects the safety of complainants and promotes accountability; and

9. Attending appropriate training annually on topics related to responding to or investigating allegations of sexual misconduct.

15

**B.** The Title IX Coordinator, in consultation with the appropriate Cabinet members, may designate deputies and investigators ("designees") to assist in carrying out any of the responsibilities related to implementing this policy.

**C.** The Title IX Coordinator shall report at the beginning of each new school year to TBR's Office of General Counsel the name of and contact information for Tennessee Tech's Title IX Coordinator.

**X.  Investigation Requirements and Procedures**

**A.** All proceedings will include a prompt, fair, and impartial investigation and result. Tennessee Tech will provide the respondent and complainant equitable rights during the investigative process.

**B.** All complaints of sexual misconduct shall be presented to the Title IX Coordinator or designee for investigation and appropriate disposition.

**C.** Mediation between the complainant and respondent will never be considered an appropriate resolution in sexual misconduct cases.

**D.** Initiating an investigation

1. Anyone wishing to file a complaint for a violation of Title IX may contact the Title IX Coordinator or any responsible employee. During business hours, the Title IX Coordinator can be reached at Foundation Hall, Room 100, 931-372-3112; after business hours, a complainant should call 911 and ask the University Police to contact the Title IX Coordinator. Alternatively, a person may file a complaint with the U.S. Department of Education, Office for Civil Rights (800-421-3481).

2. Absent good cause, within one (1) business day of receipt of a report of sexual misconduct from a complainant or responsible employee, the Title IX Coordinator or designee shall attempt to get a written statement from the complainant that includes information related to the circumstances giving rise to the complaint, the dates of the alleged occurrences, and names of witnesses, if any. The complainant may fill out a complaint form or submit a detailed written report of the alleged incident.

3. When the complainant chooses not to provide or sign a written complaint, the Title IX Coordinator or designee will investigate to the extent possible and take appropriate action.

4. Both before and during the pendency of the investigations, the Title IX Coordinator shall consider what, if any, interim measures may be necessary. See Section XIV below for more information related to interim measures.

16

5. Complaints made anonymously or by a third party will be investigated to the extent possible. Although Tennessee Tech encourages victims to talk to someone, Tennessee Tech provides an online system for anonymous reporting by students. The system will notify the user before s/he enters information that entering personally identifying information may serve as notice to Tennessee Tech for the purpose of triggering an investigation. It may be found <u>here</u>.

6. After consultation with the University Counsel, if the Title IX Coordinator determines that the complaint contains an allegation of sexual misconduct, the Title IX Coordinator shall follow the procedures set forth in this policy to investigate and adjudicate the complaint.

7. The Title IX Coordinator may appoint a qualified, sufficiently trained person to investigate the allegations made in the complaint.

8. Only one person shall be identified as the investigator, though the investigator may have a second person present during interviews to take notes.

9. Investigations shall be conducted by officials who do not have a conflict of interest or bias for or against the complainant or respondent.

10. If the complainant or respondent is a student and believes the investigator(s) has a conflict of interest, that party must submit a written explanation of the reason for that belief to the Vice President for Student Affairs. The explanation must be submitted within three (3) business days, absent good cause, of the time when the party knew or should have known the facts that would give rise to the alleged conflict of interest. The Vice President for Student Affairs will determine if the facts warrant the appointment of a different investigator and respond to the party in writing within three (3) business days, absent good cause. The decision of the Vice President for Student Affairs shall be final.

11. If the complainant or respondent is an employee and believes the investigator(s) has a conflict of interest, that party must submit a written explanation of the reason for that belief to the Vice President for Planning and Finance. The explanation must be submitted within three (3) business days, absent good cause, of the time when the party knew or should have known the facts that would give rise to the alleged conflict of interest. The Vice President for Planning and Finance will determine if the facts warrant the appointment of a different investigator and respond to the party in writing within three (3) business days, absent good cause. The decision of the Vice President for Planning and Finance shall be final.

E. **What the investigation should and should not entail**

1. Once the investigator receives the complaint, the investigator shall notify the victim in writing of his/her rights and request a meeting.

17

2. The investigator shall also notify the respondent in writing of the complaint and his/her rights and request a meeting with the respondent.

3. The investigator shall notify the complainant, respondent and all individuals interviewed during the investigation that retaliation, as defined by applicable law, is strictly prohibited and may be grounds for disciplinary action. In addition, the investigator shall advise all interviewees that they should contact the investigator immediately if they believe they are being retaliated against.

4. The investigation shall include interviews with both the complainant and respondent, unless either declines an in-person interview.

5. The complainant and respondent shall be provided with the same opportunities to have others present during any interview, including the opportunity to be accompanied by the advisor of their choice to any related meeting or proceeding.

6. Tennessee Tech will not limit the choice of advisor for either the complainant or respondent.

7. The investigation shall include interviews with relevant witnesses named by the complainant and respondent or any other potential, relevant witness made known to the investigator.

8. The investigation shall include the gathering and reviewing of any documentary, electronic, physical, or other type of relevant evidence.

9. The investigator is expected to request a list of relevant witnesses and evidence from complainant and respondent and take such into consideration.

10. The investigator shall not consider any evidence about the complainant's prior sexual conduct with anyone other than the alleged perpetrator. Evidence of a prior consensual dating or sexual relationship between the parties by itself does not imply consent or preclude a finding of sexual misconduct.

XI. **Outcome of Investigation and Determination of Appropriate Action**

A. Upon completion of the investigation, the investigator shall prepare a written report that includes the allegations made by the complainant, the response of the respondent, corroborating or non-corroborating statements of the witnesses, review of other evidence obtained, conclusions that may be drawn from the evidence gathered, and recommendations about the disposition of the matter.

18

B. It is the responsibility of the investigator to weigh the credibility of all individuals interviewed and to determine the weight to be given to information received during the course of the investigation.

C. Depending on whether the complainant is a student or involves employees, the report shall be delivered to the Vice President for Student Affairs or the Vice President for Planning and Finance.

D. After review of the report and unless the aforementioned Vice President believes additional fact finding is necessary, that Vice President shall make a determination based on a preponderance of the evidence presented as to whether or not a violation of this policy occurred and the appropriate resolution.

E. The determination made by the said Vice President shall be communicated in writing simultaneously to the complainant and respondent, along with notice to the parties of their right to request an institutional hearing on the determination that a policy violation did or did not occur.

XII. **Timeframe for Conducting the Investigation**

A. Every reasonable effort shall be made to conclude the investigation and resolve the complaint within sixty (60) calendar days following receipt of the complaint. Within this sixty (60) day timeframe, absent good cause, it is expected that the investigator will conclude the investigation, that the investigator will present a report to the Vice President for Student Affairs (if the complainant and respondent are students) or the Vice President for Planning and Finance (if the complaint involves employees). The investigator will notify the parties in writing of the Vice President's determination.

B. If the investigator or Vice President determines that additional time is needed, both parties shall be notified in writing of the delay, the anticipated date that the investigation will be concluded, and the reasons for such delay.

C. If either party determines that additional time is needed, that party shall request such in writing to the investigator if the Vice President has not yet made a determination as described in Section XI.D. The written request for additional time shall include the reasons for the requested delay and the number of additional days needed.

D. The investigator shall make every reasonable effort to respond to the request for additional time within two (2) business days following receipt of the request and shall notify both parties in writing as to whether or not the request is granted.

19

## XIII. Institutional Hearing

A. Either party may request an institutional hearing on the determination that a policy violation did or did not occur by providing written notice of the request to the investigator within ten (10) business days of receipt of the aforementioned Vice President's decision.

B. If a request is not received within ten (10) days, the Vice President's determination is final.

C. The hearing may be held before either a hearing officer or hearing committee. The President shall determine whether to proceed with a hearing officer or hearing committee and shall appoint individuals to serve in those capacities.

D. If the complainant or respondent is a student and believes the hearing officer or the hearing committee member(s) has a conflict of interest, that party must submit a written explanation of the reason for that belief to the Vice President for Student Affairs. The explanation must be submitted within three (3) business days, absent good cause, of the time when the party knew or should have known the facts that would give rise to the alleged conflict of interest. The Vice President for Student Affairs will determine if the facts warrant the appointment of a different hearing officer or committee member and respond to the party in writing within three (3) business days, absent good cause. The decision of the Vice President for Student Affairs shall be final.

E. If the complainant or respondent is an employee and believes the hearing officer or the hearing committee member(s) has a conflict of interest, that party must submit a written explanation of the reason for that belief to the Vice President for Planning and Finance. The explanation must be submitted within three (3) business days, absent good cause, of the time when the party knew or should have known the facts that would give rise to the alleged conflict of interest. The Vice President for Planning and Finance will determine if the facts warrant the appointment of a different hearing officer or committee member and respond to the party in writing within three (3) business days, absent good cause. The decision of the Vice President for Planning and Finance shall be final.

F. If such a hearing is requested, every reasonable effort shall be made to conclude the hearing and resolve the appeal, including any appeal to the President, within thirty (30) days following Tennessee Tech's receipt of the party's request for a hearing.

G. The parties to the hearing may not engage in formal discovery.

H. Each party is entitled to have an advisor of choice available; however, the advisor may not participate in the proceeding other than to render advice to the party.

I. Tennessee Tech will not limit the choice of advisor for either the complainant or respondent.

J. The complainant and respondent shall be timely notified of all meetings relevant to the proceeding and allowed to attend all hearing proceedings.

K. The hearing officer or chair of the hearing committee shall control the procedures of the hearing with due consideration given to the parties' requests related to procedures such as, but not limited to, limitations on cross-examinations, recesses so the parties may consult with their advisors, and scheduling of hearings.

L. The hearing officer or hearing committee shall use a preponderance of the evidence standard when reaching a decision.

M. Absent good cause, within five (5) business days of the close of evidence, the hearing officer or committee shall issue a written determination as to whether or not a violation of this policy occurred and the justification for this decision.

N. Each party shall be simultaneously notified of the hearing officer or committee's decision in writing, which shall include notice of their rights to appeal the hearing officer's or committee's determination to the President.

XIV. **Appeal of Hearing Decision**

A. If either party chooses to appeal the hearing officer's/committee's decision, the party shall notify the investigator in writing of the decision to appeal within five (5) business days of receipt of the hearing officer's/committee's determination.

B. If a written request for appeal is not received within five (5) days, the decision of the hearing officer/committee is final.

C. The appealing party(ies) must explain why he or she believes the factual information was incomplete, the analysis of the facts was incorrect, and/or the appropriate legal standard was not applied, and how this would change the determination in the case.

D. The President will issue a written response to the appeal as promptly as possible. This decision will constitute Tennessee Tech's final decision.

XV. **Effect of a Finding of a Violation of this Policy**

A. If a final decision has been made that a policy violation occurred, the respondent shall be referred to the appropriate personnel for a determination of discipline.

B. The appropriate personnel will be determined by the status of the respondent. For example, if the respondent is a student, the matter may be referred to the student

21

conduct officer. If the respondent is an employee, the matter may be referred to the Human Resources Department.

**C.** If the respondent is a student, Tennessee Tech will follow the procedures for disciplining students as described in Tennessee Tech Policy 302.

**D.** If the respondent is an employee, Tennessee Tech will follow the procedures related to disciplining employees as described in applicable employee policies.

**E.** Notwithstanding any policy to the contrary, the following additional requirements apply to disciplinary actions related to violations of this policy:

1. The complainant shall receive sufficient notice of and be allowed to attend any meeting or hearing during the disciplinary process;

2. The complainant shall be allowed to have an advisor of her/his choice attend any meeting or hearing;

3. The complainant shall be allowed to testify at any hearing during the disciplinary process, even if neither party intends to call the complainant as a witness during the case-in-chief;

4. The complainant shall be allowed access, consistent with the requirements of the Family Educational Rights and Privacy Act (FERPA), to any evidence presented during any disciplinary meeting or hearing;

5. The Title IX Coordinator or designee shall be appointed as the complainant's contact person for any questions or assistance during the disciplinary process; and

6. The complainant shall receive written notice, consistent with FERPA, of the outcome of the disciplinary process.

**F.** If a final decision has been made that a policy violation occurred, the Title IX Coordinator or designee shall determine any remedies needed to address the campus-wide environment, taking into consideration the impact of an incident of sexual misconduct on the campus as a whole and on specific groups or areas on campus. For example, the Title IX Coordinator or designee may determine that specific training is needed for a student group whose members have been accused of sexual misconduct.

## XVI. Tennessee Tech May Take Interim Measures

**A.** In situations that require immediate action because of safety or other concerns, Tennessee Tech will take any reasonable administrative action that is appropriate. Examples of such interim actions include, but are not limited to:

1. Providing an escort to ensure that the complainant can move safely between classes and activities;

2. Ensuring that the complainant and respondent do not attend the same classes;

3. Moving the complainant or respondent to a different residence hall;

4. Providing counseling services;

5. Providing or assisting in providing medical services;

6. Providing academic support services, such as tutoring; and

7. Arranging for the complainant to re-take a course or withdraw from a class without penalty, including ensuring that any changes do not adversely affect the complainant's academic record.

B. These remedies may be applied to one, both, or multiple parties involved.

C. Student respondents may be placed on interim suspension under the appropriate circumstances pending the outcome of the investigation. Tennessee Tech will follow Tennessee Tech Policy 302 before placing a student respondent on interim suspension.

D. Employee respondents may be, consistent with Human Resource policies, placed on administrative leave pending the outcome of the matter.

XVII. **Education and Prevention Programs**

A. Tennessee Tech engages in comprehensive educational programming to prevent sexual misconduct. Educational programming consists of primary prevention and awareness programs for all incoming students and new employees and ongoing awareness and prevention campaigns for students and faculty that:

1. Identifies domestic violence, dating violence, sexual assault and stalking as prohibited conduct;

2. Defines what behavior constitutes domestic violence, dating violence, sexual assault and stalking;

3. Defines what behavior and actions constitute consent to sexual activity in the State of Tennessee;

4. Provides safe and positive options for bystander intervention that may be carried out by an individual to prevent harm or intervene when there is a risk of domestic violence, dating violence, sexual assault and stalking against a person other than

the bystander;

5. Provides information on risk reduction so that students and employees may recognize warning signs of abusive behavior and how to avoid potential attacks; and

6. Provides an overview of information contained in the Annual Security Report in compliance with the Clery Act.

**B.** A list of programs can be found in the Annual Security Report.

**XVIII. Assistance for Victims of Sexual Misconduct: Rights and Options**

**A.** Regardless of whether a victim elects to pursue a criminal complaint, Tennessee Tech will assist victims of sexual misconduct and will provide each victim and accused with a written explanation of her/his rights as a member of Tennessee Tech.

**B.** Additionally, in the Tennessee court system, a victim of domestic violence, dating violence, sexual assault and stalking has the following rights: the right to confer with the prosecution, right to be free from intimidation, harassment and abuse throughout the criminal justice system, the right to be present at all proceedings where the defendant has the right to be present, the right to be heard, when relevant, at all critical stages of the criminal justice process as defined by the General Assembly, the right to be informed of all proceedings, and of the release, transfer or escape of the accused or convicted person, the right to a speedy trial or disposition and a prompt and final conclusion of the case after the conviction or sentence, the right to restitution from the offender and the right to be informed of each of the rights established for victims. Information related to these rights may be found here.

**C.** Tennessee Tech complies with Tennessee law in recognizing orders of protection. Any person who obtains an order of protection from Tennessee or any state should provide a copy to University Police and the Office of the Title IX Coordinator. That person may then meet with University Police to develop a Safety Action Plan, which is a plan for University Police and the person to reduce risk of harm while on campus or coming and going from campus. This plan may include, but in not limited to, escorts, special parking arrangements, providing a temporary cellphone with 911 call capability only, changing classroom location, allowing a student to complete assignments from home, etc.

**D.** Protection from abuse orders may be found here. Additional information related to such orders may be found here.

**E.** Survivors may also contact Genesis House (1-800-707-5197 or 931-526-5197; www.genesishouseinc.com). Genesis House advocates frequently assist with

24

petitions for protective orders as well as answer questions regarding protective orders and terms of conditional release (i.e. bond conditions) if there happens to be an accompanying criminal charge such as domestic assault or rape.

F. Tennessee Tech does not publish the name of crime victims nor maintain identifiable information regarding victims in the University Police's Daily Crime Log or online.

G. Victims may request that directory information on file be removed from public sources by contacting the Office of the Registrar. The Office of the Registrar may be contacted at the following: records@tntech.edu; (931) 372-3317 or (800) 268-0242 (telephone); or facsimile (931) 372-6111.

## XIX.  Resources for Victims of Sexual Misconduct

The resources listed below are not exhaustive or limited to victims who wish to make an official report or participate in an institutional hearing, police investigation or criminal prosecution. However, in cases where a victim wishes to maintain complete confidentiality, the victim should review carefully Section VII above related to the limits on Tennessee Tech's ability to maintain confidentiality.

### A.  On campus resources

| TTU Counseling Center | Business hours (Monday – Friday, 8:00 am - 4:30 pm): Roaden University Center, Room 307<br><br>AFTER business hours:<br>Option #1:   Call 911 and ask TTU Police to contact counselor on call.<br>Option #2:    Go to nearest hospital ER. | Business hours (Monday – Friday, 8:00 am - 4:30 pm): 931-372-3331<br><br>AFTER business hours:<br>Option #1:   Call 911 and ask TTU Police to contact counselor on call.<br>Option #2:    Go to nearest hospital ER.<br><br>tntech.edu/counsel |
|---|---|---|
| TTU Campus Health Services | Robert & Gloria Bell Hall, Room 100 (enter from Mahler Avenue) | Business hours (Monday – Friday, 8:00 am - 5 pm): 931-372-3320<br><br>AFTER business hours: Call 911 and ask TTU Police to contact director or designee on call<br>tntech.edu/healthservices |
| University Police (open 24 hours year | Foundation Hall, Room 100 | Emergency: 911<br>Non-emergency: 931-372- |

25

| | | |
|---|---|---|
| round) | | 3234<br><br>https://www.tntech.edu/studentaffairs/police/ |
| TTU Title IX Coordinator (for students) | Currently housed at University Police, Foundation Hall, Suite 100 | Business hours (Monday – Friday, 8:00 am – 4:30 pm): 931-372-3112<br><br>AFTER business hours: Call 911 and ask TTU Police to contact staff on call.<br><br>MHall@tntech.edu |
| TTU Title IX Officer (for employees) Associate Vice President – Human Resources | Derryberry Hall, Room 146 | Business hours (Monday – Friday, 1 am – 4:30 pm): 931-372-3034<br>equity@tntech.edu<br><br>AFTER business hours: Call 911 and ask TTU Police to contact staff on call. |
| TTU Dean of Students/ Conduct Officer | Roaden University Center, Room 339 | Business hours (Monday – Friday, 8:00 am – 4:30 pm; closed for lunch 12-1 pm : 931-372-3237<br><br>AFTER business hours: Call 911 and ask TTU Police to notify dean or designee of emergency.<br><br>tntech.edu/deanofstudents |
| Online Student Complaint Form (RE: Dean of Students Office) | NOTE: Student victims may submit information and a request for help at any hour and on any day. If desired, student may submit anonymously. This site is typically checked by authorized personnel during regular business hours. However, if you need immediate help, call 911. | https://www.tntech.edu/studentaffairs/deanofstudents/stucomplaint/studentcomplaintform<br><br>(NOTE: If you need immediate help, call 911 instead.) |
| TTU Disability Services | TTU, Roaden University Center, Rm. 112 | Business hours (Monday – Friday, 8:00 am - 4 pm; closed for lunch 12-1 pm): 931-372-6119 or 931-372-6378 |

26

| | | AFTER business hours: Call 911 and ask University Police to contact staff on call.<br><br>https://www.tntech.edu/studen taffairs/disability/ |
|---|---|---|

### B. In the Cookeville area

| | | |
|---|---|---|
| Cookeville Police | | 911 or 931-526-2300<br>www.cookevillepolice.com |
| Putnam County Sheriff | | 911 or 931-528-8484<br>www.putnamcountytn.gov/?p =departments&s=sheriff |
| Cookeville Regional Hospital | 142 West Fifth Street | 931-528-2541<br>www.crmchealth.org |
| Cookeville Ambulance Service | | 911 or 931-528-1555<br>www.putnamems.org |
| Genesis House | 24-hour Crisis Line<br><br>310 East Broad Street, Suite A | 1-800-707-5197 or 931-526-5197<br>genesishouseinc.com |
| (for Protective Orders)<br>Court Clerk's office, Justice Center<br><br>and/or<br><br>Genesis House | 421 East Spring Street | Court Clerk: 931-526-2105<br><br>Genesis House: 1-800-707-5197 or 931-526-5197 (NOTE: Genesis House advocates frequently assist with petitions for protective orders as well as answer questions regarding protective orders and terms of conditional release (i.e. bond conditions) if there happens to be an accompanying criminal charge such as domestic assault or rape.) |
| (second source for Protective Orders)<br><br>See website information for Tennessee State Courts and TCEDSV (Tennessee Coalition to End Domestic and Sexual Violence) | | Protection from abuse orders may be available through http://www.tncourts.gov/progr ams/self-help-center/forms/order-protection-forms, and additional information related to such orders may be found at http://tncoalition.org/resource s/legal-resources.html. |

27

| Putnam County Justice Center | 421 East Spring Street | |
|---|---|---|

### C. On-line resources:

- Genesis House (assists both female and male as well as heterosexual and LGBTQ survivors of sexual assault, dating violence, domestic violence, and stalking)
- Local Legal Aid Society, where survivors can consult with an attorney
- Sexual Assault Center: Counseling and Education
- Tennessee Coalition to End Domestic & Sexual Violence
- For LGBTQ survivors and support people
- Education regarding intimate partner sexual assault
- Website for male survivors of rape and sexual abuse
- Rape, Abuse and Incest National Network
- Jane Doe Inc.: The Massachusetts Coalition Against Sexual Assault and Domestic Violence
- U.S. Department of Justice
- U.S. Department of Education, Office for Civil Rights

### XX.    Retaliation

Tennessee Tech, its officers, employees, or agents are strictly prohibited from retaliating, intimidating, threatening, coercing, or otherwise discriminating against any individual for exercising their rights or responsibilities under any provision of this policy. Retaliation, as defined by applicable law, will result in disciplinary measures, up to and including termination or expulsion.

### XXI.    Interpretation

The Title IX Coordinator or his/her designee has the final authority to interpret the terms of this policy.

### XXII.    Citation of Authority for Policy

Title IX of the Education Amendments of 1972, Section 485(f) of the HEA, as amended by Section 304 of the Violence Against Women Reauthorization Act of 2013; 34 CFR § 668.41, § 668.46, and Appendix A to Subpart D of Part 668.


Approved by:

    Administrative Council:  2015-04-08

    University Assembly:  2015-04-22

Case 2:17-cv-00055   Document 41   Filed 09/05/18   Page 45 of 59 PageID #: 514

# TTU Policy 143 (Sexual Misconduct)

## INVESTIGATION MEMORANDUM

To:        Marc Burnett, Vice President for Student Affairs

From:      Marlene Hall, Title IX Coordinator

Subject:   Sexual Misconduct Investigation

Date:      January 26, 2017

## GENERAL DESCRIPTION

On September 30, 2015, the TTU Police informed me that they received formal notification that the Putnam County General Sessions Court approved an ex parte, or temporary, order of protection (OOP) filed by Complainant against Respondent. Both parties were identified as TTU students. The OOP was based upon Complainant's allegation that Respondent had sexually assaulted her on August 26 at her off-campus residence.

That same day (September 30), I sent Complainant an informational e-mail offering to meet with her. On October 5, we met at my office, where I explained her options and resources on and off campus, including the option to pursue an administrative complaint. Complainant decided to first exhaust the criminal justice option, which was already being handled by local law enforcement. Per protocol, I informed Complainant that if she later wished to file an administrative complaint, she could do so.

I also notified key offices in case Complainant decided to later pursue an administrative complaint. I was informed that they concurred that complaints regarding off-campus incidents could be pursued administratively. On November 11, Complainant expressed dissatisfaction with the criminal justice option. She also indicated interest in pursuing an administrative complaint but had questions. Over the next several days, I answered her questions, clarified information, helped acquire academic assistance, and requested copies of documents related to her case. Dr. Robert Owens was assigned as the secondary investigator, and we three met at Dr. Owens' office on December 1.

After Complainant submitted her statement, she informed me during winter break that she heard Respondent had withdrawn from TTU and had moved to another state. A subsequent Banner check indicated that Respondent was not enrolled for the next semester.

On February 6, 2016, Complainant stated she saw Respondent walking on campus. This time Banner showed Respondent as enrolled. From February 24 through March 1, I sent Respondent three e-mails, which included a letter of notice regarding the allegation and suggestions of dates and times to meet.

On March 2, a local attorney notified me that she was representing Respondent. On March 30, Dr. Owens and I interviewed Respondent in the presence of Respondent's attorney and University Counsel.

Case 2:17-cv-00055   Document 41   Filed 09/05/18   Page 46 of 59 PageID #: 515

After consulting with Complainant's attorney, on May 17 Dr. Owens and I interviewed Complainant with questions stemming from our interview with Respondent. Complainant's attorney and University Counsel were also present via speakerphones.

Dr. Owens and I also interviewed Witness 1 on May 17. Due to the combination of intoxicants brought up during this investigation, I also conducted research via online and medical consultation.

Respondent and Complainant were given "no contact" orders. Both parties and Witness 1 were instructed on the anti-retaliation provision in TTU Policy 143. All said they understood. Earlier Complainant noted that although some mutual acquaintances who attend Complainant's school might hear of the incident from Respondent, the latter does not frequent her classroom buildings because he is enrolled in an entirely different major, or school.

Complainant and Respondent were advised of resources and options for academic support and counseling. Complainant had already utilized medical assistance and victim advocacy from local resources.


## DETAILED DESCRIPTION OF ALLEGATION(S)

### A. Complainant's Allegation

Complainant alleged that Respondent had engaged in sexual intercourse without obtaining her consent. Complainant further alleged that she was unable to consent to sexual contact with Respondent due to being incapacitated as a result of being asleep and of the use of alcohol, marijuana, and possibly prescription drugs.

During this investigation, Complainant provided Dr. Owens and me with related details via interviews, a written statement, cell text records, and medical records from her ER visit. The following is based on a combination of these sources.

Complainant recalled that on Thursday, August 20, she was preparing to move to a new complex when she met Respondent and Witness 1, who were working on a car in the parking lot, and asked to borrow a screwdriver. The trio wound up hanging out together at Witness 1's apartment. All three are TTU students. Initially she thought both lived in the complex, but she later learned that Respondent lived elsewhere.

On that day and the next two, Complainant continued packing and/or the trio watched music videos and smoked Respondent's and Witness 1's marijuana. She also brought and drank wine. Contrary to Respondent's and Witness 1's accounts, Complainant said she did not touch Respondent's arm and chest muscles during her visit. When asked if the subject of Respondent's good looks arose, she recalled Respondent showing her photos in his Snapchat account, but she added that she does not really know much about Snapchat. Complainant told us she was "not interested at all, not physically" in Respondent.

She stated that on Tuesday night, August 25, she tried to call Witness 1's cell "a little after midnight" (thus Wednesday, August 26), but he did not answer. "[A]lmost immediately" after she hung up, Respondent called her from Witness 1's cell to say that Witness 1 was asleep. He then offered to bring a joint to her new place, so they could "hang out and smoke". She accepted. Contrary to Respondent's account, Complainant told us that she did "not recall inviting" Respondent to her new apartment for a drink.

Per her statement, Complainant "had already had several glasses of wine and was pretty drunk before even speaking to [Respondent] on the phone."

At 1:01 am, Respondent texted that he had arrived at the parking lot of her complex. For the next 45-60 minutes: they smoked the joint and watched music videos on the balcony; she drank more wine; and she offered Respondent a beer. Complainant told us she was unsure if she offered him a second one. When asked if she was persistent in offering Respondent any beer, she stated she was not insistent as far as serving it to him; she could not recall much about that except that it would have only been "polite" to offer a "guest" a second beer.

Contrary to Respondent's account, Complainant stated she did not recall him taking his shirt off while at her apartment. She told us that she was "100% not" interested in or attracted to Respondent. She added, "I don't and [have] not ever found [Respondent] physically attractive."

At one point after watching the videos, Complainant informed Respondent she was going to shower, left him in the kitchen, and went to her bedroom bathroom. She wondered if Respondent may have "mistakenly" been thinking he was there for sex. To ensure he would not think she was going to sleep with her, she texted him from the bathroom at 1:59 am to "head home", saying she was going to "relax in the tub" and then "go straight to bed to ... pass out". Respondent then texted twice about briefly staying until he was "good to drive". About 8 minutes later, he asked via text if she was all right and said he wanted to "make sure that you don't pass out in the bath Lol". Since she was in the tub, she missed these texts and did not reply.

Complainant stated that when she exited the tub, her intoxication seemed heavier than usual. She attributed this to taking her nightly prescriptions of Ambien (a sleeping pill) and lorazepam (a type of sedative) either just before or right after her bath. Later, she wondered if Respondent may have slipped "some sort of drug" into her drink.

Thinking Respondent had left, she donned a towel after her bath and headed toward the kitchen. Seeing he was still there, she silently headed to her bedroom, changed into pajamas, and then went to the kitchen. He said he "was too messed up to drive", so she said he could "hang out in the main part of the apartment [i.e., kitchen, living room] until he felt better" and instructed him to lock the exit door when he departed.

Complainant recalled feeling "very drunk and high" when she entered and her locked bedroom door. She went "straight to bed". From there, she texted that he could "sleep here" (i.e., the living room) if he was too tired. Respondent texted his appreciation and then asked where he should sleep (the living room had no furniture), but she had fallen asleep and thus did not reply.

When Respondent knocked on her bedroom door, Complainant awoke and opened the door. He verbally asked where he could sleep. When asked if she recalled what he was wearing at that time, Complainant said she did not recall how he was dressed; she added that he must have had at least some clothing on, because otherwise a lack of clothing would have stood out in her mind.

Since she had a "very big king size bed" in which 3 adults could easily sleep, she told him he could sleep on her bed, instructed him to "get a blanket from the living room" when he asked for a pillow, and "said clearly that [she] intended to go immediately back to sleep". She then lay down on one side of the bed. A "few minutes later", Respondent returned with the blanket and lay down on the other side.

Complainant's statement explained, "Although my memories of these last few minutes are fuzzy, I know that he made an attempt to touch me and I protested, saying explicitly that I didn't want to do anything with him; I only wanted to sleep. The last memory that I have is of him saying, 'this will help us sleep'."

We asked if she recalled anything that occurred with the remote (for mattress comfort). She said, "I don't think so." She explained that she knew the remote was there (i.e. by the bed), but she did not recall specifically talking about it or using it. She said that it would not surprise her if she had said something about the remote because she was

"really excited" about the bed's features. Complainant thought she had told Witness 1 about the remote when she and he were together, but she did not recall saying anything about it to Respondent.

Around 6:30 am, she awoke from what she initially thought was a dream in which Respondent "was having sex" with her. However, she started realizing that "it was more of a memory than a dream". She saw that he was asleep on the opposite side of the bed from her and noted that she was still dressed in her female boxer shorts, panties, and short-sleeved T-shirt. Upset and angry, Complainant shouted at Respondent, which awakened him. When she asked if he had "sex with [her] last night", he answered "yes". Panicking, she asked if he had worn a condom. When he told her "no", she angrily ordered him to leave her apartment.

Complainant explained to us that she is "too paranoid" about STDs and thus knows she "would demand" that a condom be used if she had sex with anyone she does not know well. This was consistent with her earlier statement in which she noted whether a condom was available one night when she was in an intimate situation with a new companion.

After Respondent left, she cried for a short time. She then brushed her teeth and thought to herself she was not supposed to do that. She recalled that she should not change her clothes. However, she took off her bedclothes and, after being unable to find a clean bag, she placed them in "new paper towels", then put the clothes and towels in a gallon-sized Ziploc bag, and then placed the bag in her purse. She looked up a "rape hotline" on her computer, called and was asked to call back at 8 am when staff would be available. Still upset, she called back and was instructed to go to the local ER lot, where a victim advocate would meet and accompany her.

An ER nurse noted in the medical records (see Section D.7.) that Complainant "brought [the] underwear that she had worn last night in [her] purse". The records also showed that although ER personnel gave the completed sexual assault kit to the local police detective, her "[b]elongings [were] sent with" Complainant. At a later date, Complainant filed for an order of protection (see Section D.1-4) per the suggestion of the police sergeant assisting the detective.

Later on August 26, at 5:17 pm, Respondent texted her, which led to a flurry of text exchanges involving accusations and denials. See Section D.5. for more details.

The last time Complainant and Respondent crossed paths was later in the evening on August 26. One of her friends and she went to Witness 1's apartment to pick up a box of liquor bottles that Witness 1 was storing for her. Respondent was at the apartment, but they did not speak to each other and have not contacted each other since.

## B. Respondent's Response

Respondent was provided opportunities via e-mail and at his interview to provide a written statement. None was submitted. The following is a summary of Respondent's responses during Dr. Owens' and my interview of him. University Counsel and Respondent's attorney were present during this interview.

Respondent thought Complainant, Witness 1, and he first met on Sunday, August 23. His description of how and where they met was similar to Complainant's. However, Respondent recalled they met at about 3 pm, because he was struck by how Complainant was drinking a glass of red wine during daylight hours and she asked if he wanted some; he told her he does not drink alcohol. When asked if he noticed any issues with her sobriety that day, he replied, "What [would] you think if [she was] drinking since 7 am? She talked like a normal person. She was talking."

Like Complainant, Respondent recalled that the trio's get-together evolved into a long day (3 pm into the night). However, his memory of that day had some distinct differences. He said it was Complainant, not they, who brought and offered marijuana to the group; the two men smoked, but he did not recall seeing her smoke. More than once during the interview, Respondent stated that Complainant, who is a little older, offered alcohol to them although neither was of legal drinking age. He added that neither of them drinks alcohol. (Later during the interview, he said that Witness 1 does drink but only once or twice a month.)

He stated that from the first day, Complainant repeatedly touched his arms or upper body. In the living room, as she talked about how Respondent had a "good body", she touched his chest and upper arm muscles. Other than when she was touching the aforementioned muscles, the three discussed TTU or engaged in other "normal" chat.

Respondent said that the incident in question occurred a couple nights later (thus the night of August 25/early morning hours of August 26). He stated that before going to Complainant's apartment: Witness 1 and he had dinner at 8 or 9 pm (he ate a hot dog); he later drank a Red Bull but did not eat anything else; neither Respondent nor Witness 1 consumed alcohol or marijuana. Contrary to his previous statement, Respondent told us that Witness 1 does not smoke marijuana and added that he [Respondent] smoked it with Complainant that night but that he has not smoked it any other time. Respondent told us, "I don't drink alcohol."

That night at Witness 1's apartment, Respondent played a video game while Witness 1 slept. Per Witness 1's instructions, Respondent was to answer Witness 1's cell if it rang. When Complainant called, he answered and informed her that Witness 1 was sleeping. Contrary to Complainant's statement, Respondent told us that he invited her to come and play videos, but Complainant told him to instead come to her place so they could drink. Witness 1 was unaware that Respondent left. Contrary to what Complainant told us, Respondent stated that he did not take anything, including alcohol or marijuana, to Complainant's residence.

Respondent estimated that he arrived at Complainant's apartment at midnight or 1 am. As she showed him around her new apartment, they engaged in normal conversation. Neither ate anything at her apartment. She was drinking and had a beer with her. Complainant gave Respondent a beer and later tried to encourage, or coerce, him into drinking a second one. When we asked him further about that, Respondent replied that Complainant told him, "Oh, you didn't finish this one," and she then "pushed another [beer] toward" him.

He stated that after he had been there for about 1 hour, they went from the living room to the balcony so they could smoke her marijuana and so he could smoke cigarette (she did not want the indoors to smell like "cigarette smok[e]"). Respondent also estimated he had been there for about 1 hour when they left the balcony and returned to the living room. He recalled that Complainant said it was hot in there and told him to take his shirt off. When he took off his shirt, she talked about his arms and his having a perfect body while her hands touched his upper arms and toward his back. Respondent told us that she was "touching [him] all the time".

He corroborated the fact that Complainant told him she was going to shower and that he could leave. At that point, his "head was dizzy", so he planned to stay. In the interview, he explained that he had been drinking, so he wanted to be careful. He also corroborated that when he told her he was not sure he could drive, she said it was okay for him to stay. She left to shower. He stated that he heard a sound come from the bathroom. Thinking she may have fallen, he texted, "Are you good[?] I just wanna make sure that you don't pass out in the bath Lol" He could hear the shower running, but she did not reply.

He estimated that 10-15 minutes elapsed while Complainant was in the bathroom. She then returned to the living room with only a shirt on and her hair wet. She stood next to his left side but did not touch him. She asked, "Oh, you still did not leave?" He told her he heard a noise in the bathroom when she was in there, but she did not explain what the noise was. Respondent observed that she looked okay and that there was no sign of injury. When asked about her demeanor and/or sobriety, he answered that: she talked normally; she was fully awake; her coordination seemed to be good; and she looked and sounded the same as she did before she left to shower.

Respondent corroborated the fact that Complainant said she was going to sleep and that he could leave or stay. He decided to stay. She gave him a blanket and told him he could sleep in the living room. She went to her bedroom, leaving him in the living room with no furniture to lie upon.

He estimated 15 minutes elapsed before he went to her bedroom door to obtain a pillow. He knocked on the closed door. At this point, he was wearing all his clothes, including his shirt, except he had no shoes on. He recalled that when she opened the bedroom door, she seemed to be of the same demeanor/sobriety she had been when she was in the living room earlier. She told him she only had one pillow but that he could share it with her. Later when we asked him about the pillow, he said it was of normal size. He said she smiled when she offered to share the bed. Respondent went to the living room to retrieve the blanket, made it into a pillow, and returned to her bedroom. He slept on the left side of the bed, and she slept on the right side.

Respondent described it as "a really big bed". Though they were on opposite sides of the bed, 2 more people could have fit between them. When we asked him about Complainant taking a sleeping pill, he replied that when he went to her bedroom, she did not mention she had taken a sleeping pill or any other medication'

He estimated it was approximately 3 am when sexual activity began and that it lasted about 10 minutes. He described the following. While they were sleeping, Complainant came "all the way" to the left side of his body and grabbed the remote (for mattress comfort). She explained about the remote. She had her hand on the remote and slid her hand down his arm and down his chest and torso but did not go any lower. She did this twice. During this, neither person tried to operate the buttons on the remote. Respondent put the remote back on a table by the bed. He told us, "I wasn't good because I [had been] drinking and smoking."

He stated that she then touched him by putting her thigh on him. At this point, they "had sex". He felt this was not an "accident." Later in the interview, Respondent slightly changed his explanation, stating that Complainant lay next to him with her buttocks against him at the time. He stated that she "grabbed my leg while I was behind [her]" and she was "making sounds". He told us that they "just had the sex" at that point and that Complainant "did everything, not me".

Respondent told us that he does not like to go or stay "with girls if they do not want [him]." He also said that his parents did not "raise him to rape girls and come back with shame".

Twice Respondent answered "no" whenever we asked if anyone said anything during portions of the sexual activity. He also said "no" when asked if, before any sexual activity began, he told Complainant that having sex would help them to sleep. He said that Complainant was the one who was "acting", explaining she was grabbing him by the rear of his thigh. Later in the interview, Respondent said that when Complainant put her hand on him, she pulled him toward her and made "sounds of pleasure" but did not speak. When the sexual activity ended, each went back to their respective sides of the bed and Respondent fell asleep.

When asked about his state of dress, Respondent stated that during the sexual activity, he took off his pants but kept his shirt on throughout. He said Complainant had a shirt on when they were initially in bed. During the sexual activity, he noticed that she had no panties on.

He estimated it was around 6:30 am, when Complainant woke him up; she asked him if they had sex, and he confirmed they had. When she asked him if he had worn a condom, he told her, "No, you didn't give me a condom." Complainant said "okay" and went back to sleep. He got up, splashed water on his face, and left her apartment.

Respondent then went straight to his own apartment and to bed. His roommate was not there at the time, so he did not talk to anyone at home. Nor did he tell anyone after he awoke because Complainant and he did not discuss the

situation as sexual assault until later that day. Respondent told us that he did not talk to anyone except Witness 1 about this issue.

Regarding their text exchanges later that day, Respondent told us that when he first texted her that he was sorry if he did something wrong, he was referring to his not having used a condom. He clarified that he was not referring to rape and stated "I didn't rape".

He also told us that all their discussion concerning rape and the condom issue was in the text records. He pointed out that the one exception was that morning when Complainant asked him in the bedroom whether he used a condom.

When investigators asked Respondent if there was anything else he wanted to tell us, he said the following:

- He initially said "no" but immediately changed his mind. After looking at the text records, he pointed out the text in which Complainant asked "Did I agree to have sex?" He stated that question/remark "was all about [not using] the condom".
- He then stated that Complainant gave him permission to have sex "by grabbing me".
- When he said that Complainant did not touch his genitalia, we asked if she got close to it. He said "yeah" and gestured toward his chest and torso.

Respondent last saw Complainant during the evening of August 26, when her friend and she picked up her box of liquor bottles from Witness 1's apartment. They did not speak then and have not been in contact since.

## C. Witness(s)

Witness 1: *Respondent's friend whom Complainant briefly dated and befriended -- Witness 1 is Respondent's friend with whom he spent considerable time.*

Witness 1 gave a somewhat similar description of when and how Complainant, Respondent, and he met and started hanging out for a few days at his apartment complex. He also said that he gave Complainant a tour of his apartment that first day. He stated he could not be sure what exactly the "plain white liquid" was that she was drinking from her glass when they first met. Later, however, he stated that she brought her own alcoholic beverage to his apartment as they hung out that day. He stated that neither Respondent nor he drank or offered alcohol that day.

He stated that Respondent and Complainant smoked marijuana at Witness 1's apartment, but he did not recall if it was that specific day or not.

Witness 1 recalled that on the first day they met, Respondent had his shirt off as he worked on the car. He added that Respondent often does not wear a shirt. He stated that later, while the trio were in his living room and talking about working out at the gym, which Respondent does, Complainant scooted closer to Respondent and touched his arms and chest. Witness 1 recalled this because at the time, he was thinking he should join Respondent and start working out at the gym.

Witness 1 recalled that on the night Respondent went to Complainant's new apartment, Respondent and he "ate obviously" and later Witness 1 fell asleep. Earlier Witness 1 told Respondent to answer his cell if it rang, which is why around midnight Respondent answered Complainant's call on Witness 1's cell. Witness 1 did not know who invited whom. However, Respondent told Witness 1 that he (Respondent) went to Complainant's place and was offered a drink. Witness 1 said he was not exactly sure what occurred there.

When asked if Respondent had smoked anything at Witness 1's place before heading to Complainant's, Witness 1 replied that he was unsure whether it was that month or the next when he (Witness 1) started prohibiting smoking in his apartment.

When asked if Respondent drinks alcohol, Witness 1 said he was not sure if Respondent drinks or not. He then said that Respondent is not a big drinker but does drink periodically.

When Witness 1 first heard from Complainant about what had happened, they exchanged several texts (See Section D.6.). Witness recalled this was at about noon, when he awoke and noted that Respondent was not at his apartment. He did not know where Respondent had gone.

Text records show the exchanges between Complainant and Witness 1 actually started at 06:50 am. Complainant and he continued texting throughout the day, including noontime.

He said that Complainant told him that Respondent had come to her residence and had forced sex upon her. He told us, "She was very unhappy about it."

Witness 1 stated that Complainant "talked and talked and talked" (i.e., texted). She did not phone or use other means of communication. She texted everything. Witness 1 stated that he told her that he was shocked, saying "Oh, my god, what happened?" There were several texts coming in from Complainant at once.

Witness 1 recalled he saw and spoke with Respondent 1-2 hours after hearing from Complainant. Witness 1 asked him about the incident. Witness 1 told us that Respondent told him what happened, but Witness 1 then told us that he could not recall what he had been told. He did recall that when Respondent spoke with him, he was "shocked". At the time, Witness 1 thought Respondent was in the right because Respondent told him that Complainant had given him permission to have sex with her. Therefore, Witness 1 was also shocked that Complainant had "called [Respondent] out".

Witness 1 also recalled that Respondent received several texts from Complainant. Respondent told him that he did not want to have anything to do with her because she "talks" (i.e., texts) a lot.

Witness 1 stated to us that when Complainant sent him (Witness 1) several texts, he understood that Complainant "was trying to figure out what to do". When she asked him what she should do, Witness 1 told her that he did not want to get involved between Respondent and her.

Witness estimated between 2 days to 1 week had passed since the incident, when he went to Complainant's apartment. He did not spend the night. Instead they talked about things "other than the subject [allegation]". Witness 1 told us that Complainant needed somebody to comfort her at that time, so the two of them just sat down and chatted.

| | |
|---|---|
| Witness 2: | *Police sergeant who assisted Complainant in investigation by local police of jurisdiction/city* -- I contacted Witness 2 by phone and learned she was no longer attached to the police investigation because she had left the department for unrelated reasons. She had provided support for Complainant, including recommending that Complainant file for an OOP (see Section D.1.) and helping her through that process. Witness 2 said that the detective remained assigned to the case. |

Other witnesses who were not interviewed:

1. Local medical personnel involved in Complainant's emergency room exam during the morning of Wednesday, 8/26/15 – They documented the procedures taken, their interactions with Complainant, and their notifications of local law enforcement in Complainant's medical records. Therefore, information from the medical records was used (see Section D.7. below).

2. Complainant's out-of-town friend, who stayed overnight with Complainant after the latter's emergency room exam

## D. Other Documentary Evidence

1. 9/30/15 temporary OOP (also known as ex parte OOP) approved by Putnam County General Sessions Court Case #2015D208 and with hearing date of 10/13/15

2. 10/13/15 OOP approved by Putnam County General Sessions Court Case #2015D208 and dated to expire after 1 year

3. 10/23/15 "Motion to Set Aside" document filed by Respondent's attorney and submitted to Putnam County General Sessions Court; motion requested that 10/13/15 OOP be set aside and that new 11/10/15 OOP hearing be scheduled

4. 11/24/15 "Agreed Order for Restraining Order Upon Dismissal of Ex Parte Order of Protection on January 31, 2016" for Putnam County General Sessions Court and signed by Respondent's attorney and Complainant's former attorney

5. 8/26/15 cell phone records of texts between Complainant and Respondent

   a. See Section A regarding texts before the incident in question.

   b. August 26, 12:25:25 am - 12:56:17, 8 texts -- Texts indicate that within 31 minutes, Complainant alternately gave to Respondent her correct address, then confused the numerical digits less than 10 minutes later, and corrected the numerical when Respondent indicated that he went to the wrong place due to having an incorrect address.

   c. August 26, 12:26:22 am, 1 text – Complainant asked Respondent to bring a corkscrew

   d. Regarding texts after the incident on August 26, Respondent initiated the exchange at 5:17:24 pm, when he thanked Complainant for "a great night" and, in the same sentence, said he was "sorry if [he] did something wrong". Complainant replied that he was wrong to have "sex with [her] without [her] permission". Texts were exchanged for approximately 2½ hours. Complainant repeatedly accused Respondent of not getting her consent and of raping her while she was asleep. Respondent repeatedly denied her accusations, explaining that both of them were at fault. Examples of Respondent's denials included:

      i.     "I was high and drunk in the same time[.] I'm really sorry[,] I didn't mean to do it."

      ii.    "You know I thought that would help us sleep too and if you are worried about that I didn't wear a condom[,] don't worry cause I know that I am clean and I know my limits in sex and how to do it. Again I'm sorry about everything."

      iii.   "Listen I didn't rape and please don't say this word again and you were trying to have sex with me[.] [F]rom the beginning you were touching me and made me lust."

e.    August 26, 6:17:37 pm – 6:36:26 pm, 7 texts -- In response to Respondent's text listed in Section D.5.b.iii, Complainant and Respondent had a last exchange of accusations and denials:

      C:    "Oh you're right. That was totally my fault. If I made you feel like you wanted sex then you had every right to take it."

      R:    "So it not only my fault" "Why you want to make it like it was only my fault?"

      C:    "You just can't do that" "I told you to leave and you didn't. I locked my bedroom door and you came knocking on it. I let you in and [you] waited until I fell asleep and fucked me. Without a condom" "That means it's your fault"

      R:    "No it's not my fault"

f.    On August 26, 6:37:39 pm, Complainant and Respondent told the other to leave him/her alone. Respondent additionally told Complainant not to speak to him. At 7:44:29 pm, Respondent asked Complainant if she wanted Witness 1 or him to "bring [her] stuff to [her] apt". The "stuff" he was referring to was the box of liquor bottles Witness 1 was storing for Complainant. She never replied, and no further texts occurred.

6.    8/25/15 – 9/9/15 cell phone records of texts between Complainant and Witness 1

a.    19 texts between 10:04:36 pm and 11:23:58 pm -- Confusion ensued when Complainant accidentally texted Witness 1 while trying to communicate with another of her friends.

b.    Discovering her mistake, Complainant tried at 11:45:14 pm to invite Witness 1 to her new home, but he was no longer responding due to (per his texts) being "high" or "asleep".

c.    August 26 excerpts from texts in which Complainant described to Witness 1 key elements or points of what happened between Respondent and her:

      i.     "Your friend [Respondent] called me from your home and wanted smoke and I told him he could bring over a joint and I would smoke it with him."

      ii.    "I had taken a sleeping pill and I swear I told him he could stay but not to bother me and just now I woke up ... I asked him if had had sex with me and he said he did!"

      iii.   "That is not okay! I slept with you because I wanted to but I did not agree to have sex with him"

      iv.   "...I obviously didn't want to have sex with him and I just never thought he would do it to me after I fell asleep."

7. 8/26/15 medical records regarding Complainant's visit to local emergency room; includes Encounter Summary; Nurse's Notes; Physician Documentation; Victim's Medical History and Assault Information; Visit Summary; School Release Form; Patient Profile Report; Vital Sign Report; and Sexual Assault Exam (the last document was a generic set of instructions for any sexual assault patient).

   a. Included among other information in the document entitled "Nurse's Notes":

      i. The "Presentation" section was consistent with Complainant's narrative.

      ii. The "Assessment" section stated that at 8:57 am, Complainant brought them the "underwear that she had worn last night in purse".

      iii. The "ED Section" section stated that at 11:45 am, ER personnel submitted the completed sexual assault kit to the responding local police detective.

   b. The "HPI" section located in the document entitled "Physician's Documentation" was consistent with Complainant's narrative.

      i. The "HPI" section was consistent with Complainant's narrative.

      ii. The "Disposition Summary" section stated that at 11:37 am, "Belongings [were] sent with Patient".

   c. In the form entitled "Victim's Medical History and Assault Information", which was completed by the ER nurse:

      i. She basically repeated the narrative of what Complainant told her in the "Nurse's Notes" document (see Section D.7.a.).

      ii. As the doctor did in his "Physician Documentation" (see Section D.7.b.), the nurse noted that vaginal penetration was involved.

      iii. In this form ("Victim Medical History..."), the answer given by the nurse to the question regarding "prescribed medication/alcohol/drugs taken ... prior to or after assault", was "Ambien, Lorazepam, 2 glasses of wine, ½ 12 ounce can beer".

## FINDINGS AND CONCLUSIONS

### A. Findings

Respondent corroborated key points of Complainant's allegation. He confirmed that Complainant and he engaged in sexual intercourse during the early morning hours of August 26, 2015. Both Complainant and he agreed that Complainant was drinking.

TTU Policy 143 (Sexual Misconduct) defines "sexual assault" as "the nonconsensual sexual contact with the accuser by the accused, or the accused by the accuser when . . . the sexual contact is accomplished without consent of the accuser, and the accused knows or has reason to know at the time of the contact that the accuser did not or could not consent." Policy 143 further states that "[c]onsent cannot be given by an individual who is asleep . . . or mentally or physically incapacitated, either through the effect of drugs or alcohol or for any other reason".

Both Complainant and Respondent drank alcoholic beverages and smoked marijuana that night. Although there was a discrepancy about who brought the marijuana, both parties agreed that they smoked a joint at Complainant's residence.

Complainant told the ER she had consumed a couple glasses of wine and a half can of beer as well as marijuana. Per Complainant, this consumption occurred prior to ingesting her prescriptions. It is commonly known that mixing alcohol and medications, particularly sedatives, can significantly increase intoxication levels. However, the preponderance of the evidence in this case showed that prior to taking the prescriptions, Complainant had already reached a level of intoxication that would have rendered her ability to consent questionable.

By Respondent's and Complainant's accounts, Complainant's consumption of alcohol and marijuana occurred within the space of an hour or so prior to them going to bed. In addition, Complainant stated she had consumed "several glasses" even prior to her phone call that night with Respondent. During the half hour it took Respondent to make it to her apartment, she indicated she was still drinking when she texted and asked him to bring a corkscrew.

It should be noted that one of the reasons it took Respondent a half hour to make what would ordinarily be a 15-minute drive was because Complainant became confused and at one point provided him the wrong address. The text records showed this confusion.

As stated earlier, Complainant had consumed several glasses and was "drunk" prior to the phone call. Complainant's text records show that prolonged mistaken texting and/or mistaken interpretation of who was texting whom occurred between 10:04 pm and 11:11 pm. Both Complainant and Respondent stated that their phone call occurred shortly before or at approximately midnight.

A comparison of other text exchanges to these two periods of texting did not indicate similar confusion. This would support Complainant's account of how much she had been consuming that night.

Respondent himself wondered whether Complainant may have passed out and/or injured herself while she was in the bathroom – to the point that he tried to check on her via text and later had expected her to explain the noise he heard. When Complainant texted him from the bathroom to go home, she added that she planned to go to bed and "pass out", indicating that she was extremely tired.

Respondent stated to us that Complainant had appeared normal and functional each time he saw her that night. That assessment, especially as the night progressed, did not coincide with the above stated actions and observations.

Complainant also texted Respondent that consent could not have been given while she was asleep. Respondent and Complainant alluded to Respondent having to knock on her door to awaken her that night, and Respondent stated that she was already in bed when he had to retrieve his blanket and then go to his side of the bed. Respondent also stated more than once that neither said anything when the activity in bed suddenly started or throughout the activity or at the end of that activity. Respondent clarified that he did not initiate the touching in bed, but he also never tried to make sure that Complainant was actually awake. This would have been reasonable to do in light of the drinking and drug use that night.

Respondent indicated that he was under the influence as well from the marijuana and alcohol that night. He stated that he was "dizzy" at one point and felt that he could not safely drive home. However, Complainant had offered him two beers, and he indicated that he did not necessarily finish both. He was able to assess and make a decision at least twice within that hour to determine that he should stay and not drive; during his interview, Respondent

explained further that he had "been drinking, so [he] wanted to be careful". Based on his text to her, he also was able to discern that Complainant was at risk of passing out (when she was in the bathroom).

Respondent's credibility was undermined by his assertion that he does not drink alcohol. This was contradicted by Witness 1's statement to us that Respondent drinks periodically. Respondent's own admission that he accepted Complainant's offer for him to visit her for the purpose of drinking alcohol does not seem logical, especially since he stated he had declined her offer when they first met.

Respondent's credibility was further undermined by his statement that he smoked marijuana with Complainant and not any other time. This statement contradicted his earlier one in which he said that Witness 1 and he smoked marijuana at Witness 1's apartment the first day the three met. Witness 1 alluded to Respondent's smoking but stated that he (Witness 1) could not be sure of exactly when Respondent smoked because Witness 1 could not recall if he started prohibiting smoking in his apartment that month or the next.

Respondent seemed to allude that Complainant was attracted to him before that night because, according to him, she kept touching his arms and chest while they were at Witness 1's apartment the day they met. Witness 1, however, explained that the three of them were talking about working out at the gym [deleted part of sentence stating that Respondent was shirtless] when that topic arose. Respondent never mentioned that the conversation correlated with Complainant's touching areas of the body involved in such workouts. This contradicted Respondent's earlier statement to us that Witness 1 would attest to Complainant's constant touching of Respondent. Even if this were the case, it does not outweigh Complainant's later inability to consent to sexual intercourse.

### B. Conclusions

Based on our investigation into this complaint, we find by a preponderance of the evidence that at the time they engaged in sexual intercourse, Complainant was incapacitated and unable to grant consent to such contact, and Respondent knew she was incapacitated and unable to grant consent. Accordingly, Respondent's conduct constituted "sexual misconduct" and, more specifically "sexual assault", under TTU Policy 143.

### RECOMMENDATIONS

Based on our conclusion, we recommend this matter be referred to the Office of the Dean of Students for appropriate disciplinary action.

We recommend that the Vice President adopt and approve this Investigation Memorandum.

Sarah Beth Cain
500 Dry Valley Rd, Apt E306
Cookeville, TN 38506

Nashville Clerk's Office
801 Broadway, Room 800
Nashville, TN 37203