**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **SARAH BETH CAIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:17-cv-00055** |
| | ) | **Judge Crenshaw / Frensley** |
| **TENNESSEE TECHNOLOGICAL** | ) | |
| **UNIVERSITY ("TTU"), et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

### I.  Introduction and Background

This matter is before the Court upon Judge Crenshaw's Order requesting reconsideration of Defendants' Motion to Dismiss in light of the Sexual Misconduct Policy and Investigation Memorandum supplied by Plaintiff in her Objections to the undersigned's initial Report and Recommendation.  Docket No. 48.  Because Judge Crenshaw's Order requests the undersigned to reconsider Defendants' previously-filed Motion to Dismiss in light of the new materials submitted by Plaintiff, the undersigned will discuss the relevant filings and allegations herein.

As noted, this matter was previously before the Court upon Defendants' Motion to Dismiss filed pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  Docket No. 24.[1]  Along with their Motion, Defendants contemporaneously filed a supporting Memorandum of Law.  Docket No. 25.  In their Motion, Defendants sought to dismiss Plaintiff's state law claims and 42 U.S.C.

---

[1] Also pending before the Court was a Motion to Dismiss Plaintiff's original Complaint filed by Defendants Marc Burnett, Katherine Williams, and Tennessee Technological University.  *See* Docket No. 11.  Because Plaintiff subsequently filed an Amended Complaint (Docket No. 16) and a Second Amended Complaint (Docket No. 17), Defendants' initial Motion to Dismiss (Docket No. 11) is MOOT.

§ 1983 official capacity claims for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), and Plaintiff's Title IX claims and 42 U.S.C. § 1983 individual capacity claims for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). *Id.* at 4-5. Specifically, Defendants argued that: (1) Plaintiff's 42 U.S.C. § 1983 claim and state law claims are "barred by various immunity doctrines"; (2) Plaintiff's Title IX claim is untimely; and (3) Plaintiff's factual allegations are insufficient to establish liability. Docket No. 24. Defendants argue that "[n]o amendment can feasibly cure these defects; therefore, grounds exist to dismiss the Second Amended Complaint with prejudice." *Id.*

Plaintiff, who is proceeding pro se, filed a Response to Defendants' Motion to Dismiss (Docket No. 26) and a supporting Memorandum (Docket No. 27). In her Response and Memorandum, Plaintiff argued that, "Although at first glance, it may appear that the statute of limitations for Plaintiff's claims are expired, . . . there are substantial extenuating circumstances which will be described [in her supporting Memorandum]." Docket No. 26. Plaintiff argued that "the circumstances of this case disqualify Defendants from the various types of immunity claimed in the Motion to Dismiss." *Id.* Finally, Plaintiff maintained, "a significant portion of the arguments made in the Memorandum of Law in Support of Defendants' Motion to Dismiss are predicated on the theory that Plaintiff intends to find Defendants liable for her sexual assault in August 2015. This is not the basis of any of Plaintiff's claims . . ." *Id.*

With leave of Court (Docket No. 30), Defendants filed a Reply to Plaintiff's Response (Docket No. 32). In their Reply, Defendants argued that Plaintiff's Response failed to "meaningfully respond to the arguments raised in Defendants' Motion to Dismiss," because it "contains no rebuttals to the cases cited in Defendants' Motion to Dismiss, nor does it add cases

2

that would support a finding of liability in similar factual situations." Docket No. 32.

Defendants argued that neither Plaintiff's Response nor her supporting Memorandum show that

Defendants' response to Plaintiff's sexual harassment report "meets the very high bar of

deliberate indifference required to pursue liability under Title IX." *Id.* Defendants also noted

that Plaintiff's Memorandum raised new facts, which cannot be considered for purposes of their

Motion to Dismiss because they were not alleged in the Second Amended Complaint. *Id.*, n. 1,

*citing Neal v. Shelby Cnty. Gov't Cmty. Servs. Agency*, 815 F. Supp. 2d 999, 1002-03 (W.D.

Tenn. 2011).

Also with leave of Court (Docket No. 35), Plaintiff filed a Sur-Reply (Docket No. 36). In

her Sur-Reply, Plaintiff argued that "Defendants' Reply is centered around misrepresentations of

the claims set forth in Plaintiff's Second Amended Complaint and subsequent filings.

Furthermore, Defendants attempt to impose a burden on Plaintiff's Second Amended Complaint

that is much higher than that which is required by the plausibility standard [required to survive a

Motion to Dismiss for failure to state a claim]." Docket No. 36.

After analyzing Plaintiff's claims, the evidence submitted, and the applicable law, the

undersigned recommended that Defendants' Motion to Dismiss be granted and that this action be

dismissed with prejudice. Docket No. 38. Plaintiff filed objections thereto, arguing: (1) the

undersigned "failed to reference the excessive amount of time that the University took to

respond" to the complaint and investigation, and the time taken was in contravention to TTU's

Policy 143; (2) the undersigned "assumed that Plaintiff's description of 'regular correspondence'

with university officials indicated an active investigation, but that assumption was based only

[on] the *occurrence of* communication, and it did not account for the content of those

conversations"; (3) "According to the Department of Justice, States do not have Eleventh Amendment Immunity under Title IX"; (4) "The Supreme Court has held that there are damages remedy for intentional discrimination is available [*sic*] under a Title IX private right of action"; (5) the undersigned "improper[ly] use[d] [] the Davis test in determining liability of Defendants under Title IX"; (6) the undersigned improperly concluded that the allegations of Plaintiff's Second Amended Complaint do not demonstrate that the University was deliberately indifferent to Plaintiff's peer-assault and harassment and improperly made "conclusions which are based on 'the lack of allegations during this seven-month period'"; (7) "the reasoning given for dismissal of her § 1983 claims and her Title IX claims [is erroneous] because they rely on legal theories that are mutually exclusive"; (8) the "conclusion and reasoning that Plaintiff cannot establish the requisite underlying constitutional violation to maintain her § 1983 individual capacity claims" was erroneous because the individual Defendants knew or should have known that they were not following published procedures, that Plaintiff was unable to access University resources due to fear, and that Plaintiff had paid her tuition with the expectation that she would be able to access University resources, and further that the individual Defendants' "unreasonable response" to her complaint deprived her of a property interest, a liberty interest, a reputational interest, and equal protection under the law; and (9) finally, that she has sufficiently stated federal claims such that her state claims should proceed. Docket No. 41, pp. 1-14 (emphasis original). Plaintiff also argues that the additional information she provided in her Reply to Defendants' Motion to Dismiss should be considered to support the claims in her Second Amended Complaint and that, "if this Court chooses to grant Defendants' Motion to Dismiss, that this Court also grant Plaintiff Leave to Amend so that she can refile her complaint to include the information which was

4

presented in her Reply to Defendants' Motion to Dismiss." *Id.* at 14-15.

Defendants filed a Response to Plaintiff's Objections asserting that the undersigned's recommendation was correct and should stand. Docket No. 43. Specifically, Defendants respond: (1) the undersigned "referenced and discussed the length of the investigation on many occasions but ultimately concluded that the length of the investigation alone does not constitute deliberate indifference as a matter of law 'given the level of involvement Plaintiff herself avers the University had in responding to, and investigating, her sexual assault allegations'"; (2) the undersigned "did not find that the University was actively investigating Plaintiff's complaint at all times; nor did it need to make such a finding"; (3) "Even considering Plaintiff's new arguments and allegations, there is no legal authority supporting her contention that these facts rise to the level of a *constitutional* deprivation"; (4) "a university 'does not 'have a federal due process obligation to follow all of its procedures'"; rather, the "question is whether Plaintiff alleged non-conclusory facts showing that the University deprived her of the due process guaranteed by the Fourteenth Amendment," which she did not; (5) the undersigned correctly recommended "dismissal of Plaintiff's Title IX claims against the individual defendants because the Sixth Circuit has repeatedly held that there is no individual liability under Title IX, not because of Eleventh Amendment immunity"; (6) the undersigned "correctly employed two different tests for evaluating the § 1983 official capacity claims and the Title IX individual capacity claims" that are "separate and distinguishable from one another"; (7) the undersigned correctly applied the Davis test and simply noted, not relied upon, the lack of "post-notification harassment"; (8) the undersigned correctly found that Plaintiff's allegations do not demonstrate that the University was deliberately indifferent and Plaintiff cites no authority to support her

Case 2:17-cv-00055   Document 49   Filed 05/28/19   Page 5 of 46 PageID #: 562

contention that a university's response could rise to the level of deliberate indifference in just a few weeks; (9) "a university's 'failure to comply with its own policy does not prove deliberate indifference, under clear Supreme Court precedent'"; (10) "being slow to respond to a few e-mails" does not constitute "'an official decision by the [University] . . . not to remedy the violation'"; and (11) "Plaintiff's factual allegations show that the University was pursuing, rather than being indifferent to, Plaintiff's administrative complaint." *Id.* at 2-7 (emphasis original).

Plaintiff filed a Reply to Defendants' Response to her Objections maintaining that because she is pro se, this Court should consider her additional arguments and submissions because she "has only modified her filings to respond to the specific concerns raised by the Defense in each of their filings." Docket No. 46, p. 2. Plaintiff argues that, "[i]n order to ensure fairness, she should be permitted to submit iterations to her filings to reconcile the disparity in legal expertise that could only be afforded through experiential learning." *Id.* Plaintiff replies that Defendants' lengthy investigation response to her off-campus sexual assault by another student was "unreasonable in light of the known circumstances" such that she has satisfied the Davis test and stated a claim under Title IX. *Id.* at 3-4. Plaintiff further replies that Defendants deprived her of her property and liberty interests by "creating an environment in which Plaintiff did not feel safe accessing the University's facilities or resource centers," which resulted in barring her "from the freedom to acquire useful knowledge as long as TTU continued to allow the hostile educational environment to exist." *Id.* at 5-6. Plaintiff argues that "[t]he University's response posed a serious and imminent risk of an erroneous deprivation of Plaintiff's property and liberty interests" due limitations that "resulted from her fear of encountering her attacker on campus." *Id.* at 6.

6

Plaintiff, in her Reply, "does not dispute that a university does not 'have a federal due process obligation to follow all of its procedures' nor does she dispute that 'the question is whether Plaintiff alleged non-conclusory facts showing that the University deprived her of the due process guaranteed by the Fourteenth Amendment,'" but she avers that "TTU's published procedures [] point out that TTU was aware of its obligations to take *some* action to help Plaintiff mitigate the property and liberty interests which were sure to be endangered by the constant possibility that she might encounter her attacker on campus." *Id*. at 6 (emphasis original). Plaintiff adds that she "had a property interest in benefits offered by the university and a liberty interest in the freedom to acquire useful knowledge, both of which were denied to her by Defendants' conduct." *Id.* Plaintiff argues that the "University could have taken steps to prevent the deprivation of Plaintiff's property and liberty interests without undertaking actions that were detrimental to any government interest and without imposing additional fiscal and administrative burdens on the University." *Id.* at 7. Plaintiff additionally replies that Defendants violated her right to equal treatment under the law because of the "disparity" in which they treated her and her averred attacker. *Id.* at 8. Specifically, she argued that: (1) she was interviewed multiple times without an attorney present, while her averred attacker was interviewed once with his attorney; (2) she was required to provide a written statement of her account, while her averred attacker was not; and (3) Plaintiff's access to University resources was limited by her fear of her attacker, while her averred attacker continued to enjoy full access to all University common areas and benefits. *Id.* Plaintiff argues that "Defendants stalled the conclusion of their investigation until Respondent had voluntarily left the University and thus Defendants denied Plaintiff the opportunity to be heard at a meaningful time." *Id.* Plaintiff notes that the three examples of

7

slow-response emails were merely illustrative, not exhaustive, and she argues, "the University's dismal response to Plaintiff's complaint effectively protected Respondent and safeguarded *his* interests in benefits offered by the school at the expense of Plaintiff's property and liberty interests." *Id.* Finally, Plaintiff reiterates her contention that Defendants are not protected by either qualified immunity or Eleventh Amendment immunity, and she renews her assertion that she has stated claims under the applicable theories such that Defendants' Motion should be denied or she should be given the opportunity to "refile her complaint to remedy any procedural errors which may have disqualified relevant information from consideration." *Id.* at 9-10.

For the reasons discussed below, the undersigned finds that Plaintiff's submission of TTU Policy 143, TTU's Investigation Memorandum, and her objections do not change the undersigned's original findings and recommendation. Plaintiff's objections are legally meritless and the undersigned renews his recommendation that Defendants' Motion to Dismiss (Docket No. 24 be GRANTED and that this action be DISMISSED WITH PREJUDICE.

## II. Allegations of Plaintiff's Second Amended Complaint and Objection Submissions

## A. Allegations of Plaintiff's Second Amended Complaint

### 1. General Allegations

Plaintiff, pro se, filed her Second Amended Complaint in this action on December 29, 2017, pursuant to 42 U.S.C. § 1983 and Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"). Docket No. 17. Specifically, Plaintiff avers that Defendants violated her rights under Title IX by discriminating against her, creating a hostile environment that effectively deprived her of the educational opportunities and benefits provided by the University, and being deliberately indifferent to the continued harassment of Plaintiff by her assailant.

8

Docket No. 17, pp. 8-13.  Plaintiff further avers that Defendants violated her rights under § 1983 by failing to provide Plaintiff with the process that she was due because they failed to follow TTU's policies and procedures, failed to adequately conduct the sexual assault investigation, failed to take any action against the assailant, failed to complete the investigation that was begun for nearly two years after Plaintiff filed her complaint, and failed to keep her informed as to the status of the investigation.  *Id.* at 13-14.

Plaintiff further avers that the acts and omissions of Defendants have caused the intentional infliction of emotional distress upon her such that she has been under the care of mental health professionals who specialize in post-traumatic stress disorder ("PTSD") continuously since her sexual assault in August 2015.  *Id.* at 14.  Specifically, Plaintiff contends that Ms. Hall had detailed knowledge of the acute PTSD symptoms from which Plaintiff suffered, but nevertheless posed questions suggesting that Plaintiff was partly at fault for her rape and the accusatory questions posed to her during the March 17, 2016 interview with Ms. Hall and Mr. Owens caused her to unnecessarily recount the trauma of her rape and have resulted in her suffering serious mental and emotional injuries that impair her enjoyment of daily life.  *Id.* at 14-15.

Plaintiff finally avers that the acts and omissions of Defendants Hall, Carpenter, Burnett, Williams, and Owens deprived her of full access to University resources and created a hostile sexual educational environment because they breached TTU's duty to take action in response to her report of sexual assault, they failed to adhere to the policies and procedures set out in TTU's Policy 143 by neglecting to review the investigation report for more than two months after it was sent and failing to send Plaintiff a copy of the investigation report for over two months after it

9

was issued, and they failed to take any disciplinary action against the assailant either before or after the investigation. *Id.* at 15. Plaintiff maintains that as a direct and proximate result of Defendants' negligence, she suffered severe emotional distress. *Id.* at 15-16.

As to her Title IX and §1983 claims, Plaintiff sues Defendants in their individual and official capacities. *Id.* at 8, 18. For her Intentional Infliction of Emotional Distress claim, Plaintiff sues Defendants Hall and Owens in their individual capacities. *Id.* at 14. Regarding her Negligent Infliction of Emotional Distress Claim, Plaintiff sues Defendants Hall, Carpenter, Burnett, Williams, and Owens in their individual capacities. *Id.* at 15. Plaintiff seeks compensatory damages in an amount to be determined by the Court that includes pre and post judgment interest, injunctive relief, costs, and other relief as the Court may deem proper. *Id.* at 16-17.

### 2. Factual Allegations

Plaintiff avers that she was sexually assaulted in her off-campus apartment on August 26, 2015; that, as a result, she underwent examination and received treatment; that she sought to pursue criminal charges against her assailant; and that she filed to receive an Order of Protection from her assailant. *Id.*, ¶¶ 13-17. Plaintiff avers that a copy of her Order of Protection was thereafter sent to Defendant's campus police department. *Id.*, ¶ 17.

Plaintiff maintains that, on or about October 1, 2015, Defendant's Title IX Coordinator Marlene Hall contacted her via email and requested a meeting so that she could explain to Plaintiff the options for filing an administrative complaint against Plaintiff's assailant for sexual misconduct. *Id.*, ¶ 18. Plaintiff and Ms. Hall met on October 5, 2015 in Ms. Hall's office on the TTU campus, and Ms. Hall informed Plaintiff about Plaintiff's right to file an administrative

complaint. *Id.*, ¶ 19. Plaintiff reports that she explained that she wanted to attempt to pursue her options in the criminal and civil justice systems before trying to navigate the procedural steps of an administrative complaint, and that Ms. Hall assured her that she could later choose to file an administrative complaint. *Id.*, ¶ 20. Also during the October 5, 2015 meeting, Plaintiff reports that she described to Ms. Hall the "severe emotional effects" which she had been suffering since her assault. *Id.*, ¶ 21. Plaintiff avers that those "severe emotional effects" include having difficulty with focus and problems with her working memory. *Id.* Plaintiff asserts that Ms. Hall confirmed that many of the psychological effects described by Plaintiff in the meeting were not uncommon for a victim to experience in the aftermath of a rape. *Id.*

Plaintiff additionally avers that she contacted Ms. Hall on November 11, 2015 to request that the University proceed with an administrative investigation and take disciplinary action against her assailant. *Id.*, ¶ 22. Plaintiff met with Ms. Hall the following day, on November 12, 2015, to recount the details of her rape and to file her administrative complaint. *Id.*, ¶ 23. While at the November 12, 2015 meeting, Plaintiff reports that Ms. Hall assured her that the University would investigate her claim. *Id.* Also during the November 12, 2015 meeting, Plaintiff provided her assailant's name to Ms. Hall and Ms. Hall indicated that there was a possibility that she knew of another incident involving allegations against Plaintiff's assailant. *Id.*, ¶ 24. Plaintiff reports requesting additional information about such allegations, but Ms. Hall declined to definitively confirm or deny the existence of other claims against the assailant that were then-pending. *Id.*

Plaintiff contends that for several weeks after their November, 12, 2015 meeting, Plaintiff and Ms. Hall corresponded regularly. *Id.*, ¶ 25. Plaintiff reports that in these correspondences, Ms. Hall continued to assure Plaintiff that she could file the administrative complaint, and further

informed Plaintiff, during several of these conversations, that Ms. Hall would need to speak to University Counsel to assure that Plaintiff's claim fell into "Clery or Title IX Geography." *Id.* Plaintiff avers that Ms. Hall subsequently confirmed to Plaintiff that she had conferred with University Counsel and that TTU would be able to conduct an investigation into the assault. *Id.* Ms. Hall requested another meeting with Plaintiff and with Dr. Robert Owens, Ms. Hall's Title IX Investigator. *Id.* Plaintiff, Ms. Hall, and Dr. Owens met on December 1, 2015. *Id.*, ¶ 26. During that meeting, Plaintiff recounted the painful details of the circumstances surrounding her rape by the named assailant. *Id.*

During the period of time between Plaintiff's request for an administrative investigation and the end of the Fall 2015 semester, Plaintiff avers that she contacted Ms. Hall multiple times, via both telephone and email to express her mounting anxiety and the emotional distress caused by the assault and her subsequent struggles to keep up in her classes. *Id.*, ¶ 27.

In January 2016, Plaintiff engaged Alex Little as her counsel to assist her in her communications with TTU. *Id.*, ¶ 28. In February and March 2016, Mr. Little telephoned Ms. Hall and insisted that TTU launch an investigation into the sexual assault of Plaintiff. *Id.*, ¶29. TTU did not interview Plaintiff's assailant until March 12, 2016. *Id.*, ¶ 30.

On Plaintiff's behalf, Mr. Little wrote to Ms. Hall on May 2, 2016 requesting "An immediate update" regarding the status of the investigation and notifying Ms. Hall that Plaintiff "specifically demand[s] that the University initiate disciplinary proceeding[s]" against Plaintiff's attacker "before the end of the semester." *Id.*, ¶ 31.

On May 6, 2016, Kae Carpenter, University Counsel, responded to Mr. Little via letter, in which she declined to provide an update about the investigation or initiate disciplinary

12

proceedings against Plaintiff's assailant. *Id.*, ¶ 32. Ms. Carpenter further informed Mr. Little that Plaintiff would need to meet with Ms. Hall and Mr. Owens to answer follow-up questions that arose during their interview with Plaintiff's assailant. *Id.*

On May 17, 2016, Plaintiff met with Ms. Hall and Mr. Owens to answer their follow-up questions. *Id.*, ¶ 33. The questions which were posed by Mr. Owens and Ms. Hall were largely unrelated to the substance of Plaintiff's sexual assault, and, according to Plaintiff, were re-victimizing, as they inferred blame on her part and required her to again recount the most painful details of her rape. *Id.*

On January 11, 2017, Mr. Little again wrote Ms. Carpenter to inform her of Plaintiff's intent to sue TTU for its failure to comply with Title IX with respect to the sexual assault committed against her by a fellow student on August 26, 2015. *Id.*, ¶ 34. In his letter, Mr. Little also proposed the possibility of engaging a mediator to "work with the parties to facilitate the process that could lead to a settlement - even before the filing of a complaint." *Id.*, ¶ 35.

On February 2, 2017, Ms. Carpenter sent an email to Mr. Little confirming that TTU "is amenable to mediating the issues raised in your January 11, 2017 letter." *Id.*, ¶ 36. Ms. Carpenter also wrote in this email that she had "placed a hold on calendars of Tennessee Tech officials for the dates of April 4-7." *Id.* On March 10, 2017, Mr. Little's associate, Mandy Strickland-Floyd, wrote to Ms. Carpenter with a proposed list of mediators, dates, and locations. *Id.*, ¶ 37.

On March 23, 2017, Ms. Strickland-Floyd informed Plaintiff that a mediation with TTU had been confirmed for April 3, and that Plaintiff's attendance at this meeting would be required. *Id.*, ¶ 38. Plaintiff objected because that meeting would interfere with her final exams, which were scheduled by the University. *Id.* On March 28, 2017, Ms. Strickland-Floyd sent Plaintiff

an email stating, "It may be possible to have the University reschedule your exam so you can attend on April 3, given the number of lawyers that have already planned to be there." *Id.*, ¶ 39. Also in her email, Ms. Strickland-Floyd attached a FERPA waiver to authorize TTU to disclose Plaintiff's educational records for purposes of mediation. *Id.*, ¶ 40. Plaintiff reluctantly agreed to try to speak to her professor about rescheduling her final exam. *Id.*, ¶ 41. Plaintiff approached her professor the next day, but was denied the opportunity to retake the exam. *Id.*

On Thursday, March 30, 2017, Ms. Carpenter notified Plaintiff, by and through Mr. Little, that TTU was no longer agreeable to mediation, would not be present for the April 3 mediation, and was not interested in rescheduling. *Id.*, ¶ 42. Ms. Carpenter also informed Mr. Little that TTU had concluded its Title IX investigation into the sexual assault of Plaintiff. *Id.* Later that afternoon, Ms. Hall emailed Mr. Little a copy of TTU's Investigation Memorandum and a notification to Plaintiff that, "Tennessee Tech has completed its investigation and the Vice President has concurred in the findings and recommendations detailed in the attached investigative memorandum." *Id.*, ¶ 43. The memorandum attached to Ms. Hall's email was a thirteen page investigative report from Ms. Hall to Mr. Marc Burnett, Vice President for Student Affairs, that concluded that the named assailant's conduct constituted "sexual misconduct," and more specifically, "sexual assault" under TTU Policy 143. *Id.*, ¶¶ 44, 45. The report further included recommendations that the findings of the report be adopted by the Vice President of Student Affairs and that the matter be forwarded to the Office of the Dean of Students for appropriate disciplinary action. *Id.*

**B. Relevant Investigation and Timeline Provisions of TTU Policy 143: Sexual Misconduct**

Section VII (E)(1) of TTU Policy 143 provides: "When a complainant tells a responsible

14

employee about an incident of sexual misconduct, Tennessee Tech will take immediate and

appropriate steps to investigate what happened and to resolve the matter promptly and equitably."

Docket No. 41, pp. 17-45 at p. 28.

> **VIII. Tennessee Tech's Response to a Report of Sexual Misconduct**
>
> A.    Tennessee Tech will take ongoing steps to protect the complainant from retaliation or harm and work with the complainant to create a safety plan. Retaliation, as defined by applicable law, against the complainant, whether by students or Tennessee Tech employees, will not be tolerated.
>
> B.    After appropriate consideration of confidentiality requirements and to the extent reasonable, Tennessee Tech will:
>
>> 1.    Assist the complainant in accessing other available victim advocacy, academic support, counseling, disability, health or mental health services, and legal assistance both on and off campus (see Section XIV below for more information on interim measures);
>>
>> 2.    Provide other security and support, which could include issuing a no-contact order, helping arrange a change of living or working arrangements or course schedules (including for the alleged perpetrator pending the outcome of an investigation) or adjustments for assignments or tests; and
>>
>> 3.    Inform the complainant of the right to report a crime to campus or local law enforcement and provide assistance if the complainant wishes to do so.
>
> C.    While respecting the limits of confidentiality, the Title IX Coordinator will review reports to

15

determine if broader remedial action is required; such broader remedial action may include but is not limited to increased monitoring, supervision or security at locations where the reported sexual misconduct occurred, increased education and prevention efforts, including to targeted population groups, conducting climate assessments / victimization surveys, and / or revisiting its policies and practices.

*Id.* at 31-32.

## X.     Investigation Requirements and Procedures

A.     All proceedings will include a prompt, fair, and impartial investigation and result. Tennessee Tech will provide the respondent and complainant equitable rights during the investigative process.

B.     All complaints of sexual misconduct shall be presented to the Title IX Coordinator or designee for investigation and appropriate disposition.

C.     Mediation between the complainant and respondent will never be considered an appropriate resolution in sexual misconduct cases.

D.     Initiating an investigation

1.     Anyone wishing to file a complaint for violation of Title IX may contact the Title IX Coordinator or any responsible employee. . . .

2.     Absent good cause, within one (1) business day of receipt of a report of sexual misconduct from a complainant or responsible employee, the Title IX Coordinator or designee shall attempt to get a written statement from the complainant that includes information related to the circumstances giving rise to the complaint the dates of the alleged occurrences, and

16

names of witnesses, if any.  The complainant may fill out a complaint form or submit a detailed written report of the alleged incident.

3.      When the complainant chooses not to provide or sign a written complaint, the Title IX Coordinator or designee will investigate to the extent possible and take appropriate action.

4.      Both before and during the pendency of the investigation, the Title IX Coordinator shall consider what, if any, interim measures may be necessary.  See Section XIV below for more information related to interim measures.

5.      Complaints made anonymously or by a third party will be investigated to the extent possible. . . .

6.      After consultation with the University Counsel, if the Title IX Coordinator determines that the complaint contains an allegation of sexual misconduct, the Title IX Coordinator shall follow the procedures set forth in this policy to investigate and adjudicate the complaint.

7.      The Title IX Coordinator may appoint a qualified, sufficiently trained person to investigate the allegations made in the complaint.

8.      Only one person shall be identified as the investigator, though the investigator may have a second person present during the interviews to take notes.

9.      Investigations shall be conducted by officials who do not have a conflict of interest or bias for or against the complainant or respondent.

17

10.    If the complainant or respondent is a student and believes the investigator(s) has a conflict of interest . . .

11.    If the complainant or respondent is an employee and believes the investigator(s) has a conflict of interest . . .

E.    What the investigation should and should not entail

1.    Once the investigator receives the complaint, the investigator shall notify the victim in writing of his / her rights and request a meeting.

2.    The investigator shall also notify the respondent in writing of the complaint and his / her rights and request a meeting with the respondent.

3.    The investigator shall notify the complainant, respondent and all individuals interviewed during the investigation that retaliation, as defined by applicable law, is strictly prohibited and may be grounds for disciplinary action. In addition, the investigator shall advise all interviewees that they should contact the investigator immediately if they believe they are being retaliated against.

4.    The investigation shall include interviews with both the complainant and respondent, unless either declines an in-person interview.

5.    The complainant and respondent shall be provided with the same opportunity to be accompanied by the advisor of their choice to any related meeting or proceeding.

6.    Tennessee Tech will not limit the choice of

18

advisor for either the complainant or respondent.

7.     The investigation shall include interviews with relevant witnesses named by the complainant and respondent or any other potential, relevant witness made known to the investigator.

8.     The investigation shall include the gathering and reviewing of any documentary, electronic, physical, or other type of relevant evidence.

9.     The investigator is expected to request a list of relevant witnesses and evidence from complainant and respondent and take such into consideration.

10.    The investigator shall not consider any evidence about the complainant's prior sexual conduct with anyone other than the alleged perpetrator. . . .

## XI.     Outcome of Investigation and Determination of Appropriate Action

A.     Upon completion of the investigation, the investigator shall prepare a written report that includes the allegations made by the complainant, the response of the respondent, corroborating or non-corroborating statements of the witnesses, review of other evidence obtained, conclusions that may be drawn from the evidence gathered, and recommendations about the disposition of the matter.

B.     It is the responsibility of the investigator to weigh the credibility of all individuals interviewed and to determine the weight to be given to information received during the course of the investigation.

C.     Depending on whether the complainant is a student

19

or involves employees, the report shall be delivered to the Vice President for Student Affairs or the Vice President for Planning and Finance.

D.    After review of the report and unless the aforementioned Vice President believes additional fact finding is necessary, that Vice President shall make a determination based on a preponderance of the evidence presented as to whether or not a violation of this policy occurred and the appropriate resolution.

E.    The determination made by the said Vice President shall be communicated in writing simultaneously to the complainant and respondent, along with notice to the parties of their right to request an institutional hearing on the determination that a policy violation did or did not occur.

## XII.    Timeframe for Conducting the Investigation

A.    Every reasonable effort shall be made to conclude the investigation and resolve the complaint within sixty (60) calendar days following receipt of the complaint. Within this sixty (60) day timeframe, absent good cause, it is expected that the investigator will conclude the investigation, that the investigator will present a report to the Vice President for Student Affairs (if the complainant and respondent are students) or the Vice President for Planning and Finance (if the complaint involves employees). The investigator will notify the parties in writing of the Vice President's determination.

B.    If the investigator or Vice President determines that additional time is needed, both parties shall be notified in writing of the delay, the anticipated date that the investigation will be concluded, and the reasons for such delay.

C.    If either party determines that additional time is needed, that party shall request such in writing to the investigator if the Vice President has not yet

20

made a determination as described in Section XI.D.
The written request for additional time shall include
the reasons for the requested delay and the number
of additional days needed.

D.      The investigator shall make every reasonable effort
        to respond to the request for additional time within
        two (2) business days following receipt of the
        request and shall notify both parties in writing as to
        whether or not the request is granted.

*Id.* at 33-36.

## XV.     Effect of Finding of a Violation of this Policy

A.      If a final decision has been made that a policy
        violation occurred, the respondent shall be referred
        to the appropriate personnel for a determination of
        discipline.

B.      The appropriate personnel will be determined by the
        status of the respondent.  For example, if the
        respondent is a student, the matter may be referred
        to the student conduct officer. If the respondent is
        an employee, the matter may be referred to the
        Human Resources Department.

C.      If the respondent is a student, Tennessee Tech will
        follow the procedures for disciplining students as
        described in Tennessee Tech Policy 302.

D.      If the respondent is an employee . . .

E.      Notwithstanding any policy to the contrary, the
        following additional requirements apply to
        disciplinary actions related to violations of this
        policy:

        1.      The complainant shall receive sufficient
                notice of and be allowed to attend any
                meeting or hearing during the disciplinary
                process;

21

2.  The complainant shall be allowed to have an advisor of his / her choice attend any meeting or hearing;

3.  The complainant shall be allowed to testify at any hearing during the disciplinary process, even if neither party intends to call the complainant as a witness during the case-in-chief;

4.  The complainant shall be allowed access, consistent with the requirements of the Family Educational Rights and Privacy Act (FERPA), to any evidence presented during any disciplinary meeting or hearing;

5.  The Title IX Coordinator or designee shall be appointed as the complainant's contact person for any questions or assistance during the disciplinary process; and

6.  The complainant shall receive written notice, consistent with FERPA, of the outcome of the disciplinary process.

F.  If a final decision has been made that a policy violation occurred, the Title IX Coordinator or designee shall determine any remedies needed to address the campus-wide environment, taking into consideration the impact of an incident of sexual misconduct on the campus as a whole and on specific groups or areas on campus. . . .

**XVI. Tennessee Tech May Take Interim Measures**

A.  In situations that require immediate action because of safety or other concerns, Tennessee Tech will take any reasonable administrative action that is appropriate. Examples of such interim actions include, but are not limited to:

1.  Providing an escort to ensure that the complainant can move safely between

22

classes and activities;

2.     Ensuring that the complainant and respondent do not attend the same classes;

3.     Moving the complainant or respondent to a different residence hall;

4.     Providing counseling services;

5.     Providing or assisting in providing medical services;

6.     Providing academic support services, such as tutoring; and

7.     Arranging for the complainant to re-take a course or withdraw from a class without penalty, including ensuring that any changes do not adversely affect the complainant's academic record.

B.     These remedies may be applied to one, both, or multiple parties involved.

C.     Student respondents may be placed on interim suspension under the appropriate circumstances pending the outcome of the investigation. Tennessee Tech will follow <u>Tennessee Tech Policy 302</u> before placing a student respondent on interim suspension.

D.     Employee respondents . . .

*Id.* at 38-41.

## C. Relevant Portions of TTU's Investigation Memorandum

On January 30, 2017, Title IX Coordinator Marlene Hall issued a thirteen page

Investigation Memorandum regarding Plaintiff's complaint. Docket No. 41, pp. 46-58. This

Memorandum was sent to Vice President for Student Affairs, Marc Burnett. *Id.* Because the

23

Investigation Memorandum contains detailed factual recitals of the off-campus events both leading up to, and following, Plaintiff's averred sexual assault, the undersigned will not recount the details of the Memorandum in its entirety; but rather, will include only those details relevant to the investigation itself.

On September 30, 2015, the TTU Police informed me that they received formal notification that the Putnam County General Sessions Court approved an ex parte, or temporary, order of protection (OOP) filed by Complainant against Respondent. Both parties were identified as TTU students. The OOP was based upon Complainant's allegation that Respondent had sexually assaulted her on August 26 at her off-campus residence.

That same day (September 30), I sent Complainant an informational e-mail offering to meet with her. On October 5, we met at my office, where I explained her options and resources on and off campus, including the option to pursue an administrative complaint. Complainant decided to first exhaust the criminal justice option, which was already being handled by local law enforcement. Per protocol, I informed Complainant that if she later wished to file an administrative complaint, she could do so.

I also notified key offices in case Complainant decided to later pursue an administrative complaint. I was informed that they concurred that complaints regarding off-campus incidents could be pursued administratively. On November 11, Complainant expressed dissatisfaction with the criminal justice option. She also indicated interest in pursuing an administrative complaint but had questions. Over the next several days, I answered her questions, clarified information, helped acquire academic assistance, and requested copies of documents related to her case. Dr. Robert Owens was assigned as the secondary investigator, and we three met at Dr. Owens' office on December 1.

After Complainant submitted her statement, she informed me during her winter break that she heard Respondent had withdrawn from TTU and had moved to another state. A subsequent Banner check indicated that Respondent was not enrolled for the next semester.

24

On February 6, 2016, Complainant stated she saw Respondent walking on campus. This time Banner showed Respondent as enrolled. From February 24 through March 1, I sent Respondent three e-mails, which included a letter of notice regarding the allegation and suggestions of dates and times to meet.

On March 2, a local attorney notified me that she was representing Respondent. On March 30, Dr. Owens and I interviewed Respondent in the presence of Respondent's attorney and University Counsel.

After consulting with Complainant's attorney, on May 17, Dr. Owens and I interviewed Complainant with questions stemming from our interview with Respondent. Complainant's attorney and University Counsel were also present via speakerphone.

Dr. Owens and I also interviewed Witness 1 on May 17. Due to the combination of intoxicants brought up during this investigation, I also conducted research via online and medical consultation.

Respondent and Complainant were given "no contact" orders. Both parties and Witness 1 were instructed on the anti-retaliation provision in TTU Policy 143. All said they understood. Earlier Complainant noted that although some mutual acquaintances who attended Complainant's school might hear of the incident from Respondent, the latter does not frequent her classroom buildings because he is enrolled in an entirely different major, or school.

Complainant and Respondent were advised of resources and options for academic support and counseling. Complainant had already utilized medical assistance and victim advocacy from local resources.

. . .

During this investigation, Complainant provided Dr. Owens and me with related details via interviews, a written statement, cell text records, and medical records from her ER visit. . . .

*Id.* at 46-47.

The investigation also states that the last time Complainant and Respondent saw each

25

other was in the evening of August 26, when Complainant and her friend went to Witness 1's apartment to pick up a box of liquor bottles that Witness 1 was storing for Complainant and Respondent was at the apartment. *Id.* at 49, 52. Although Complainant and Respondent saw each other, they did not speak to each other and have not contacted each other since. *Id.*

The Investigation Memorandum reveals that Ms. Hall interviewed Complainant, Respondent, and Witness 1. *Id.* at 46-58. She additionally spoke via telephone with Witness 2, the police sergeant who assisted Complainant in investigation by local police, and learned that she was no longer with the police department but that she had provided support for Complainant, including recommending that Complainant file for an order of protection and helping her through that process. *Id.* at 53. Ms. Hall additionally reviewed the medical records from Complainant's emergency room medical examination, which included "Encounter Summary; Nurse's Notes; Physician Documentation; Victim's Medical History and Assault Information; Visit Summary; School Release Form; Patient Profile Report; Vital Sign Report; and Sexual Assault Exam"; the temporary order of protection issued September 30, 2015; the order of protection issued October 13, 2015 that was to be in force for one year; the October 23, 2015 "Motion to Set Aside" document filed by Respondent's attorney and submitted to Putnam County General Sessions Court; the November 25, 2015 "Agreed Order for Restraining Order Upon Dismissal of Ex Parte Order of Protection on January 31, 2016"; and the August 26, 2015 cell phone records of texts between Complainant and Respondent; the cell phone records of texts between Complainant and Witness 1 dated August 25, 2015 - September 9, 2015. *Id.* at 47-56.

Ultimately, the Investigation Memorandum concluded:

> Based on our investigation into this complaint, we find by a

26

> preponderance of the evidence that at the time they engaged in
> sexual intercourse, Complainant was incapacitated and unable to
> grant consent to such contact, and Respondent knew she was
> incapacitated and unable to grant consent. Accordingly,
> Respondent's conduct constituted "sexual misconduct" and, more
> specifically "sexual assault", under TTU Policy 143.

*Id.* at 58.

Based on this conclusion, Ms. Hall recommended that the Vice President adopt and approve the Investigation Memorandum and that the matter be referred to the Office of the Dean of Students for appropriate disciplinary action. *Id.*

### III.  Law and Analysis

#### A.  Fed. R. Civ. P. 12(b)(1) and 12(b)(6)

Defendants assert Fed. R. Civ. P. 12(b)(1) and 12(b)(6) as grounds for their Motion to Dismiss. Docket No. 24. Fed. R. Civ. P. 12(b)(1) provides that a complaint may be dismissed for lack of subject matter jurisdiction, while Fed. R. Civ. P. 12(b)(6) provides that a complaint may be dismissed if it fails to state a claim upon which relief can be granted. The Court will focus on the Rule 12(b)(6) Motion.[2]

Fed. R. Civ. P. 12(b)(6) provides that a claim may be dismissed for failure to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory. *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). Conclusory allegations or legal conclusions masquerading as factual allegations will not

---

[2] A dismissal for failure to state a claim upon which relief can be granted is a dismissal on the merits. *See Federated Dept. Stores, Inc., v. Moitie*, 452 U.S. 394, 399 n. 3 (1981); *Pratt v. Ventas, Inc.*, 365 F. 3d 514, 522 (6th Cir. 2004). It is therefore unnecessary for the Court to discuss Defendants' arguments under Rule 12(b)(1).

27

suffice.  *Id.*

The Court will construe the complaint in the light most favorable to the nonmoving party, accept its allegations as true, and draw all reasonable inferences in favor of the nonmoving party. *See Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).  The Federal Rules of Civil Procedure require only that the pleadings contain "a short and plain statement of the claim" that will provide fair notice of what the claims are and the grounds upon which they rest.  *See* Fed. R. Civ. P. 8; *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

A complaint containing a statement of facts that merely creates a suspicion of a legally cognizable right of action is insufficient.  *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1965 (2007).  The "[f]actual allegations must be enough to raise a right to relief above the speculative level"; they must "state a claim to relief that is plausible on its face."  *Id*. At 1965, 1974.  *See also, Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007).

Moreover, the United States Supreme Court has addressed the current appropriate standard that must be applied in considering a Motion to Dismiss for failure to state a claim.  *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  The *Iqbal* Court stated in part as follows:

> Two working principles underlie our decision in *Twombly*.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice . . . . Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss . . . . Determining whether a complaint states a plausible claim for relief will, as the Court of

28

Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not "show[n]" - "that the pleader is entitled to relief."

556 U.S. at 678-79 (citations omitted).

## B.  20 U.S.C. § 1681 ("Title IX")

Plaintiff alleges violation of her rights under 20 U.S.C. § 1681, *et seq.* ("Title IX").

Docket No. 17.  20 U.S.C. § 1681(a) provides, in pertinent part:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...

Title IX grants a private right of action for both injunctive relief and monetary damages against a recipient of federal funds. *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 72-73 (1992); *Cannon v. University of Chicago,* 441 U.S. 677, 688-89 (1979).

The Supreme Court has expressly rejected the use of "principles of respondeat superior or constructive notice" for imposing liability on a funding recipient under Title IX.  *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 285 (1998).  *See also Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 642 (1999).  In order to hold a funding recipient liable for damages under Title IX, a plaintiff must demonstrate that an "appropriate person" within the funding recipient had actual notice of the harassment and was deliberately indifferent to it.  *Gebser*, 524 U.S. at 292-293.  An "appropriate person" for Title IX purposes is, at a minimum, an official of the funding recipient with authority to take corrective action to end the discrimination.  *Gebser*, 524 U.S. at 290.

29

If the federal funding recipient did not engage in harassment directly, it is not liable for damages unless its deliberate indifference subjects its students to harassment, either by causing them to undergo harassment or make them liable or vulnerable to it. *Davis*, 526 U.S. at 644-45. Moreover, since the harassment must occur under the operations of a funding recipient, the harassment must occur in a context subject to the school's control. *Id.* Additionally, in order to recover damages, the harassment must have been "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650.

Deliberate indifference occurs when an official who, at a minimum, has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf, has actual knowledge of the discrimination and fails adequately to respond. *Gebser*, 524 U.S. at 290. An official's response or lack thereof is inadequate when it is clearly unreasonable in light of the known circumstances. *Davis*, 526 U.S. at 648. Courts may determine, as a matter of law, whether a response was "clearly unreasonable." *Id.*, at 649.

## C. 42 U.S.C. § 1983

### 1. Generally

Plaintiff alleges violations of her Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983. *See* Docket No. 17. Section 1983 provides, in part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper

30

proceeding for redress...

Thus, in order to state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55 (1988)*, citing Parratt v. Taylor,* 451 U.S. 527, 535, 101 S. Ct. 1908, 1913, 68 L. Ed. 2d 420 (1981) (overruled in part on other grounds, *Daniels v. Williams,* 474 U.S. 327, 330-331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)); *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S. Ct. 1729, 1733, 56 L. Ed. 2d 185 (1978). The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 49, 108 S. Ct. 2255*, quoting United States v. Classic,* 313 U.S. 299, 326, 61 S. Ct. 1031, 1043, 85 L. Ed. 1368 (1941).

## 2. Fourteenth Amendment

### a. Generally

The Fourteenth Amendment provides in pertinent part that:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV.

### b. Due Process

The Fourteenth Amendment's Due Process Clause has a substantive component that is separate and distinct from its procedural component. *Seum v. Osborne,* 348 F. Supp. 3d 616, 633

31

(E.D. Ky. 2018), *citing Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996). The substantive component "serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used." *Id.* (citations omitted). The goal of the procedural component "is to minimize the risk of substantive error, to assure fairness in the decision-making process, and to assure that the individual affected has a participatory role in the process." *Id.* "The touchstone of procedural due process is the fundamental requirement that an individual be given the opportunity to be heard 'in a meaningful manner.' " *Id.*, *quoting Loudermill v. Cleveland Bd. of Educ.*, 721 F.2d 550, 563 (6th Cir. 1983), *aff'd*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). In order to present a procedural due process claim under 42 U.S.C. 1983, the plaintiff must "show that the defendant acted under the color of state law to deprive the plaintiff of a definite liberty or property interest." *See, e.g., Doe v. DeWine,* 910 F.3d 842, 851 (6th Cir. 2018), *quoting Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 539 (6th Cir. 2002).

### c. *Equal Protection*

In order to state a cognizable equal protection claim, a § 1983 plaintiff must allege that he/she is a member of a protected class, and that a state actor intentionally discriminated against him/her on the basis of his/her membership in that protected class. *See, e.g., Henry v. Metropolitan Sewer Dist.*, 922 F. 2d 332, 341 (6th Cir. 1990).

### 3. Official Capacity Claims

In complaints alleging federal civil rights violations under § 1983, "[a]n official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity

which that agent represents." *Claybrook v. Birchwell*, 199 F.3d 350, 355 n.4 (6th Cir. 2000), *citing Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). *See also, Frost v. Hawkins County Bd. of Educ.*, 851 F.2d 822, 827 (6th Cir. 1988). As such, when a public employee is sued in his or her official capacity, the claims are essentially made against the public entity. *Id*.

### 4. Individual Capacity Claims

As an initial matter, § 1983 liability cannot be predicated upon the theory of *respondeat superior*. *Polk County v. Dodson*, 454 U.S. 312, 325 (1981). *See also, Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978); *Street v. Corrections Corp. of America*, 102 F.3d 810, 818 (6th Cir. 1996). In order for Defendants to be held liable in their individual capacities, therefore, Plaintiff must demonstrate that the individual Defendants personally condoned, encouraged, or participated in the conduct that allegedly violated Plaintiff's rights. *Birrell v. Brown*, 867 F.2d 956, 959 (6th Cir. 1989) (citations omitted). *See also, Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir. 1984), *citing Hays v. Jefferson County,* 668 F. 2d 869, 872-74 (6th Cir. 1982) (The supervisor must have "at least implicitly authorized, approved or knowingly acquiesced in" the misconduct.) Conclusory allegations are not enough. *See Street,* 886 F.2d at 1479. *See also, Anderson,* 477 U.S. at 257; *Nix v. O'Malley,* 160 F.3d 343, 347 (6th Cir. 1998); *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888 (1990); *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir. 1990). Plaintiff must establish a "causal connection between the misconduct complained of and the official sued." *Dunn v. State of Tennessee*, 697 F.2d 121, 128 (6th Cir. 1982).

33

**D.  The Case at Bar**

As an initial matter, although Plaintiff argues that since she is pro se, "fairness" dictates that she "be permitted to submit iterations to her filings to reconcile the disparity in legal expertise that could only be afforded through experiential learning" and further dictates that this Court should consider her additional arguments and submissions because she "has only modified her filings to respond to the specific concerns raised by the Defense in each of their filings" (Docket No. 46, p. 2), the undersigned notes that while the Court will liberally construe the complaint in the light most favorable to the nonmoving party, accept its allegations as true, and draw all reasonable inferences in favor of the nonmoving party (*see Directv, Inc.*, 487 F.3d at 476; *Inge*, 281 F.3d at 619; *Boag v. MacDougall,* 454 U.S. 364, 365 (1982); *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1990)), Federal Rules of Civil Procedure 8  requires that the pleadings contain "a short and plain statement of the claim" that will provide fair notice of what the claims are and the grounds upon which they rest.  "Fairness" therefore entails Defendants knowing what the allegations are against them and being able to proceed accordingly.  "Fairness" does not entail Plaintiff being able to circumvent the notice requirements by constantly being "permitted to submit iterations to her filings" and "modif[y] her filings to respond to the specific concerns raised by the Defense in each of their filings."  Plaintiff's request to be allowed to, at this stage in the proceedings, yet again amend her Complaint in an attempt to "cure" the deficiencies in her allegations that prevent her recovery should be DENIED.

Additionally as a preliminary matter, the myriad of Plaintiff's objections relating to Defendants' failure to follow all of  the provisions of TTU Policy 143 in and of itself cannot

establish that Defendants violated her rights under Title IX. The Supreme Court has held that an alleged failure of a school to comply with its policies and regulations does not establish the requisite actual notice and deliberate indifference that are necessary to establish Title IX liability. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291-92 (1998). The proper inquiry is not whether the school followed its own policies, but rather, whether the appropriate people had actual knowledge and were deliberately indifferent. *See, e.g., id.*[3] The undersigned will analyze Plaintiff's Title IX claims using the relevant inquiry below.

With regard to the myriad of Plaintiff's objections relating to Defendants' failure to follow all of the provisions of TTU Policy 143 and the resultant impact on whether Defendants violated her Due Process rights or other rights under § 1983, the Sixth Circuit has repeatedly held that whether a University followed its own internal procedures is not the proper inquiry. *See, e.g., JiQiang Xu v. Michigan State Univ.*, 195 F. App's 452, 457-58 (6th Cir. 2006); *Purisch v. Tenn. Tech. Univ.*, 76 F.3d 1414, 1423(6th Cir. 1996); *Levine v. Torvik*, 986 F.2d 1506 1515 (6th Cir. 1993). With respect to Due Process specifically, the Sixth Circuit has found that violations of a state's formal procedure do not in and of itself implicate constitutional due process concerns, because the proper inquiry is whether the plaintiff was afforded the due process guaranteed under the Fourteenth Amendment, not under a state or internal policy. *Id.* In so finding, the Sixth Circuit explained, "A state cannot be said to have a federal due process obligation to follow all of its procedures; such a system would result in the constitutionalizing of every state rule, and

---

[3] When evaluating whether the University was deliberately indifferent, the Court can consider adherence to or departure from official policies as one aspect of the totality of the actions or inactions at issue. Failure to follow official policies can therefore be a relevant consideration, but is not, in and of itself, sufficient to impose liability.

would not be administrable." *JiQiang Xu*, 195 F. App'x at 457, *quoting Levine*, 986 F.2d at 1515. Plaintiff, in her Reply to Defendants' Response to her objections, so concedes (Docket No. 46, p. 6), and the undersigned will analyze Plaintiff's § 1983 claims using the appropriate inquiry below.

Before analyzing whether the allegations of Plaintiff's Second Amended Complaint state a claim upon which relief can be granted under the legal theories raised, the undersigned notes that Plaintiff's argument that the legal theories of Title IX and § 1983 are mutually exclusive conflates legal standards, as Title IX and § 1983 claims utilize two separate and distinct legal standards, the elements of which will be discussed below, and all of which must be established in order to sustain a claim. *See analysis below.*

Addressing Plaintiff's official capacity § 1983 claims, Defendant TTU and its employees stand in the shoes of the State of Tennessee. The law is well-settled that a state is not a "person" within the meaning of § 1983. *See, e.g., Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Clark v. Kentucky*, 229 F.Supp.2d 718, 722 (E.D. Ky. 2002). Moreover, Eleventh Amendment immunity protects states, as well as state officials in their official capacities, from being sued in federal court for money damages (*Boler v. Early*, 865 F.3d 391, 409-10 (6th Cir. 2017)), and, although Plaintiff argues in her Objections to the contrary, no exceptions to Eleventh Amendment immunity are applicable to Plaintiff's § 1983 official capacity claims. Accordingly, Plaintiff cannot maintain her § 1983 official capacity claims against Defendants and those claims should be DISMISSED WITH PREJUDICE.

Turning next to Plaintiff's individual capacity § 1983 claims, in order to prevail on her

36

§ 1983 claims, Plaintiff must establish that the individual Defendants personally condoned, encouraged, or participated in the conduct that allegedly violated Plaintiff's rights. *Birrell v. Brown*, 867 F.2d 956, 959 (6th Cir. 1989) (citations omitted). Although Plaintiff argues that Defendants violated her due process rights by failing to follow their own policies and procedures, failing to adequately conduct the sexual assault investigation, taking two years to complete the investigation, failing to keep her informed as to the status of the investigation, and failing to take any disciplinary action against her assailant, Plaintiff's allegations are conclusory. Moreover, as discussed above, Defendants' failure to follow all of the provisions of Policy 143 alone is insufficient to establish that Defendants, in their individual capacity, violated Plaintiffs' Due Process rights.

Analyzing whether Defendants' individual actions or inactions constituted violations of Plaintiff's Due Process rights, the inquiry is whether Plaintiff has alleged non-conclusory facts showing that Defendants deprived her of the due process guaranteed by the Fourteenth Amendment. As noted above, Plaintiff's Due Process allegations are conclusory. Additionally, the Investigation Memorandum establishes that Defendants exchanged numerous emails with Plaintiff, met with Plaintiff on several occasions, explained to Plaintiff what on and off campus options and resources were available to her, answered Plaintiff's questions, clarified information for Plaintiff, helped acquire academic assistance for Plaintiff, obtained a written statement from Plaintiff, obtained and reviewed cellular telephone text message records from Plaintiff, obtained and reviewed medical records from Plaintiff's emergency room visit; obtained and reviewed the documents, agreements, and Orders related to Plaintiff's criminal case; conducted an initial interview of Plaintiff, interviewed Plaintiff's alleged attacker in the presence of his attorney and

37

University counsel, conducted a second interview of Plaintiff with consent of her attorney and with Plaintiff's attorney and University counsel present via speaker phone, interviewed "Witness 1," spoke to "Witness 2" via telephone, conducted online research, obtained medical consultation, issued "no-contact" orders to both Plaintiff and her averred attacker; advised Plaintiff, her attacker, and "Witness 1" of the anti-retaliation provision in Policy 143; and advised Plaintiff and her averred attacker of available resources and options for academic support and counseling. Docket No. 41, pp. 46-56. The Investigation Memorandum therefore establishes that Plaintiff was given sufficient opportunities to be heard and to meaningfully participate in the investigation process such that she received the Due Process guaranteed under the Fourteenth Amendment. Plaintiff therefore cannot sustain her Due Process claim, and it should be DISMISSED WITH PREJUDICE.

Additionally, although Plaintiff avers that Defendants' investigation took too long, leaving her in continued fear of seeing her attacker and resulting in the deprivation of her property and liberty interests in freely accessing University resources and obtaining educational benefits, the Investigation Memorandum establishes that Defendants issued "no contact"orders to Plaintiff and her alleged attacker, and that the last time Plaintiff and her attacker saw each other was on August 26, 2015, when Plaintiff and her friend went to "Witness 1's" off-campus apartment to pick up a box of liquor bottles that "Witness 1" was storing for Plaintiff and her averred attacker was at the apartment, and that although Plaintiff and her averred attacker saw each other, they did not speak to each other and have not contacted each other since. *Id*. at 49, 52. The Investigation Memorandum also establishes that Plaintiff informed Defendant Hall during her Winter 2015 break that she had heard that her averred attacker had withdrawn from

38

the University and had moved to another state, and that the University conducted a Banner check which indicated that Plaintiff's averred attacker was not enrolled for the next semester. *Id.* at 46-47. The Investigation Memorandum further establishes that neither Plaintiff nor Defendants were aware that Plaintiff's alleged attacker had returned to the University until February 6, 2016, when Plaintiff reported that she had seen her averred attacker walking on campus and Defendants conducted a new Banner check confirming that Plaintiff's alleged attacker was once again enrolled in the University. *Id.* While Plaintiff's residual fear and its resultant impact on her University experience is understandable, the facts at hand do not justify the legal attribution of causation or deprivation to Defendants.

Addressing Plaintiff's allegation that Defendants violated her Equal Protection rights, Plaintiff argues that she was treated disparately from her averred attacker because: (1) she was required to provide a written statement, while her averred attacker was not; (2) she was interviewed twice without her attorney, while her averred attacker was interviewed only once and had his attorney present;[4] and (3) Plaintiff's access to University resources was limited by her fear of her attacker, while her averred attacker continued to enjoy full access to all University common areas and benefits. Docket No. 46, p. 8. Plaintiff fails, however, to allege that she is a member of a protected class, and that Defendants intentionally discriminated against her on the basis of her membership in that protected class. *See, e.g., Henry*, 922 F. 2d at 341. Accordingly, Plaintiff cannot sustain her Equal Protection claim and it should be DISMISSED WITH

_____

[4] The Investigation Memorandum establishes that once Plaintiff retained counsel, Defendant Hall contacted Plaintiff's counsel to coordinate Plaintiff's follow-up interview and further establishes that Plaintiff's counsel and University counsel were both present via speaker phone during Plaintiff's second interview. Docket No. 41, pp. 46-47.

39

PREJUDICE.

The allegations of Plaintiff's Second Amended Complaint, taken as true, simply do not demonstrate that Defendants violated her Due Process or Equal Protection rights. Plaintiff therefore cannot establish the requisite underlying constitutional violation. Absent a constitutional violation, Plaintiff cannot maintain her § 1983 individual capacity claims against Defendants those claims should be DISMISSED WITH PREJUDICE.

Turning to Plaintiff's Title IX claims, as an initial matter, Title IX does not provide for the imposition of individual liability; rather, Title IX applies to recipients of federal funds. *See Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999). Because the individual Defendants are not themselves recipients of federal funds, they cannot be held liable, and Plaintiff's Title IX claims against them should be DISMISSED WITH PREJUDICE.

With respect to Plaintiff's Title IX claims against TTU, as discussed above, the proper inquiry is not whether TTU followed its own policies, but rather, whether the appropriate people at TTU had actual knowledge and were deliberately indifferent. *Gebser*, 524 U.S. at 291-92. The allegations of Plaintiff's Second Amended Complaint and the Investigation Memorandum establish that the appropriate people at TTU had actual knowledge of Plaintiff's report of an August 2015 off-campus peer assault, resultant medical evaluation, and subsequent criminal proceedings. *See* Docket Nos. 17, 41. The allegations of Plaintiff's Second Amended Complaint and the Investigation Memorandum further establish that the appropriate people at TTU had actual knowledge of Plaintiff's administrative complaint filed and subsequent investigation. *Id.* Thus, the critical inquiry is whether these appropriate TTU people were deliberately indifferent.

40

The Sixth Circuit, in *Davis*, discussed deliberate indifference as follows:

> Both the "deliberate indifference" standard and the language of Title IX narrowly circumscribe the set of parties whose known acts of sexual harassment can trigger some duty to respond on the part of funding recipients. Deliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment. A recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action.

> The language of Title IX itself—particularly when viewed in conjunction with the requirement that the recipient have notice of Title IX's prohibitions to be liable for damages—also cabins the range of misconduct that the statute proscribes. The statute's plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs. If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference "subject[s]" its students to harassment. That is, the deliberate indifference must, at a minimum, "cause [students] to undergo" harassment or "make them liable or vulnerable" to it. Random House Dictionary of the English Language 1415 (1966) (defining "subject" as "to cause to undergo the action of something specified; expose" or "to make liable or vulnerable; lay open; expose"); Webster's Third New International Dictionary 2275 (1961) (defining "subject" as "to cause to undergo or submit to: make submit to a particular action or effect: EXPOSE"). Moreover, because the harassment must occur "under" "the operations of" a funding recipient, see 20 U.S.C. § 1681(a); § 1687 (defining "program or activity"), the harassment must take place in a context subject to the school district's control, Webster's Third New International Dictionary, *supra,* at 2487 (defining "under" as "in or into a condition of subjection, regulation, or subordination"; "subject to the guidance and instruction of"); Random House Dictionary of the English Language, *supra,* at 1543 (defining "under" as "subject to the authority, direction, or supervision of").

> These factors combine to limit a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known

41

> harassment occurs. Only then can the recipient be said to "expose"
> its students to harassment or "cause" them to undergo it "under"
> the recipient's programs.

*Davis*, 526 U.S. at 644–45.

Although Plaintiff argues that the length of time between when she filed her complaint and when the University concluded its investigation and issued its investigative report was excessive and in violation of Policy 143, and therefore evidences the University's deliberate indifference, taking the allegations of Plaintiff's Second Amended Complaint and the Investigation Memorandum as true, Plaintiff's allegations establish that, from the time the University learned of Plaintiff's August 26, 2015 off-campus sexual assault until the time Ms. Hall and Mr. Owens conducted their follow-up interview of her on May 16, 2016, Plaintiff, her counsel, and University employees were in regular communication, the University was responding to Plaintiff's allegations, and the University was conducting its investigation. Docket Nos. 17, 41, 46. The allegations of Plaintiff's Second Amended Complaint and the Investigation Memorandum further establish that Plaintiff was informed of her right to file an administrative complaint with the University; Plaintiff later did, in fact, file her administrative complaint with the University; the University conducted an investigation, interviewing Plaintiff and her assailant separately and interviewing Plaintiff a second time to ask follow-up questions; the University wrote a thirteen page report regarding its findings and conclusions about its investigation; and throughout the process, Plaintiff had regular communication and multiple meetings with University employees regarding, *inter alia*, her attack, the investigation, her PTSD and other psychological effects, and her declining grades and resultant financial aid difficulties. *Id.*

42

Additionally, as discussed above, the Investigation Memorandum establishes that Defendants exchanged numerous emails with Plaintiff, met with Plaintiff on several occasions, explained to Plaintiff what on and off campus options and resources were available to her, answered Plaintiff's questions, clarified information for Plaintiff, helped acquire academic assistance for Plaintiff, obtained a written statement from Plaintiff, obtained and reviewed cellular telephone text message records from Plaintiff, obtained and reviewed medical records from Plaintiff's emergency room visit; obtained and reviewed the documents, agreements, and Orders related to Plaintiff's criminal case; conducted an initial interview of Plaintiff, interviewed Plaintiff's alleged attacker in the presence of his attorney and University counsel, conducted a second interview of Plaintiff with consent of her attorney and with Plaintiff's attorney and University counsel present via speaker phone, interviewed "Witness 1," spoke to "Witness 2" via telephone, conducted online research, obtained medical consultation, issued "no-contact" orders to both Plaintiff and her averred attacker; advised Plaintiff, her attacker, and "Witness 1" of the anti-retaliation provision in Policy 143; and advised Plaintiff and her averred attacker of available resources and options for academic support and counseling. Docket No. 41, pp. 46-56. Given the facts at hand, the undersigned cannot conclude as a matter of law that Defendants were deliberately indifferent as defined by Title IX and applicable law.

The allegations of Plaintiff's Second Amended Complaint further establish that from January 11, 2017 through the issuance of the University's thirteen page investigative report and subsequent refusal to mediate Plaintiff's claims, the University had concluded its investigation and Plaintiff, her counsel, and University employees were again in regular communication. *Id.* While there are no allegations in the record concerning what, if anything, may have occurred

43

between May 16, 2016 and January 11, 2017, given the level of involvement Plaintiff herself avers the University had in responding to, and investigating, her sexual assault allegations and resultant PTSD, anxiety, declining academic performance, and loss of financial aid, the undersigned cannot say that the lack of allegations during this seven month period is sufficient to constitute deliberate indifference as a matter of law, particularly when considering the totality of the circumstances discussed above, and in light of no allegation of continued harassment by her assailant.[5]

---

[5] In fact, the only allegation of post-notification harassment Plaintiff avers in her Second Amended Complaint is as follows:

> Several months after the February 25 [no contact order] email was sent, Plaintiff entered the TTU library, where she saw [her assailant] staring at her. According to [Plaintiff], she began to panic, but could not leave because she was meeting a study group. Plaintiff found her study group and sat with them, where she tried to engage in the course work, but [her assailant] remained staring at her and loudly speaking to his friends in Arabic for nearly a half an hour before departing the library. *Plaintiff never reported this incident to anyone at the school* because, according to Plaintiff, Defendant Hall had given her the impression that both [Plaintiff and her assailant] had "no contact" orders for each other, and [Plaintiff] feared that she could be reprimanded for entering the library when [her assailant] was already there.

Docket No. 17, p. 11 (emphasis added).

Significantly, Plaintiff acknowledges never reporting this incident to anyone at the University. The University cannot be deliberately indifferent to that of which it is unaware and would have no reason to be aware. Accordingly, as far as the University was aware, the *only* incident of Plaintiff's averred peer-on-peer harassment was the off-campus sexual assault that set in motion the chain of events leading to the filing of this action. Given the scope of the investigation, the level of involvement of both Plaintiff and her counsel, and the lack of continued contact or harassment, the undersigned cannot find as a matter of law that Defendants' investigative response was "unreasonable in light of the known circumstances."

44

Because the allegations of Plaintiff's Second Amended Complaint and Investigation Memorandum do not demonstrate that the University was deliberately indifferent to Plaintiff's peer-assault and harassment, Plaintiff cannot sustain her Title IX claim against the University and those claims should be DISMISSED WITH PREJUDICE.

As to Plaintiff's pendent state law claims, because the undersigned recommends that the instant Motions to Dismiss be granted, the undersigned further recommends that this Court should decline to exercise supplemental jurisdiction over Plaintiff's pendent state law claims; those claims should be dismissed without prejudice. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966).

## IV.  Conclusion

For the foregoing reasons, the undersigned finds that Plaintiff's Objections are legally meritless and that no further briefing is necessary.  Accordingly, the undersigned once again recommends that Defendants' Motion to Dismiss (Docket No. 24) be GRANTED, that this action be DISMISSED WITH PREJUDICE.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court.  Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections.  Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985),

*reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

JEFFERY S. FRENSLEY
United States Magistrate Judge