FILED

JUN 2 8 2019 DB

U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN.

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

| | |
|---|---|
| Sarah Beth Cain, )<br><br>Plaintiff, )<br><br>v. )<br><br>Tennessee Technological University, Marc )<br>Burnett, (individually and in his official )<br>capacity), Katherine Williams (individually )<br>and in her official capacity), Robert Owens, )<br>(individually and in his official ) capacity, Kae )<br>Carpenter (individually and in her official )<br>capacity), Marlene Hall (individually and in )<br>her official capacity) )<br>)<br>)<br>Defendants. )<br>)<br>_____ ) | NO. 2:17-cv-00055<br>CHIEF JUDGE CRENSHAW<br>MAGISTRATE JUDGE FRENSLEY |

## PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE JUDGE'S SECOND REPORT AND RECOMMENDATION AND MOTION FOR DE NOVO DETERMINATION

### INTRODUCTION AND BACKGROUND

Plaintiff, Sarah Beth Cain, filed her Second Amended Complaint "Second Amended Complaint" (Docket No. 17) on December 29, 2017, against Tennessee Technological University ("TTU")("University") , and Marc Burnett, Katherine Williams, Robert Owens, Kae Carpenter and Marlene Hall ("individual Defendants") (collectively, "Defendants") for violations of Title

1

IX of the Education Amendment Acts of 1972, violations of Plaintiff's Due Process rights and Equal Protection rights guaranteed by the Fourteenth Amendment, and two state claims for intentional and negligent infliction of emotional distress.

Specifically, Plaintiffs causes of action are as follows: TTU violated its obligations under Title IX by failing to conduct a timely investigation into Plaintiffs report of being raped by another student, Defendants' indifference facilitated a sexually hostile educational environment and prevented Plaintiff from accessing resources provided by the University. Defendants' failure to comply with their own policies or to take another line of action consistent with the requirements outlined by Title IX and the Fourteenth Amendment deprived Plaintiff of property and liberty interests that she was due, without giving her notice or an opportunity to be meaningfully heard.

On August 8, 2018, Magistrate Judge Frensley filed a Report and Recommendation ("Initial Report") (Docket No. 38), recommending that Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint be granted. Plaintiff filed Objections to the Initial Report and included two documents that had not previously been in front of the magistrate judge. In light of the new documents, Chief Judge Crenshaw entered an order requesting the reconsideration of the Motion to Dismiss. On May 28, 2019, Magistrate Frensley filed another Report and Recommendation ("Report" or "R&R"), again recommending that Defendants'' Motion to Dismiss Plaintiff's Second Amended Complaint be granted and the Complaint be dismissed with prejudice.

## OBJECTIONS TO R&R

Under § 636(b)(1)(C) this Court must make *a de novo* determination of those portions of the Report to which objection is made. Plaintiff thus submits these detailed objections to

preserve matters for this Court's review as well as for subsequent review. As explained below,

Plaintiff respectfully objects to the following:

1. The Report does not comply with the legal standard required for deciding a Motion to Dismiss filed under Fed. R. Civ. P 12(b)(6).

   a. The Report does not draw all reasonable inferences in favor of the nonmoving party.

   b. The Report does not liberally construe the complaint in the light most favorable to the nonmoving party.

2. Plaintiff objects to certain factual findings and omissions in the R&R.

   a. The R&R erroneously concludes that defendants have not been given proper notice of the allegations against them.

   b. Plaintiff objects to the R&R's assertion that plaintiff was given the opportunity to be meaningfully heard during TTU's investigation.

3. Plaintiff objects to the R&R's conclusion that no exceptions to Eleventh Amendment Immunity are applicable to this case.

4. Plaintiff objects to the R&R's assertion that Title IX does not provide for the imposition of individual liability.

5. Plaintiff objects to the Report's conclusion that the allegations contained in Plaintiff's Second Amended Complaint do not demonstrate that the University was deliberately indifferent to plaintiff's peer-assault and harassment.

   a. Defendants' conduct was clearly unreasonable in light of the known circumstances

      I. Defendants allowed months of inactivity to permeate their purported investigation

      II. The time that it took for Defendants to conduct and conclude an investigation into plaintiff's complaint was excessive.

      III. Defendants' refused to provide plaintiff with requested information about the status or existence of an investigation.

   b. Defendants' conduct caused plaintiff to be vulnerable to further harassment

6. Plaintiff objects to the Report's assertion that the legal standards for Title IX and U.S.C. *§ 1*983 cannot be mutually exclusive.

7. Plaintiff objects to the R&R's conclusion and reasoning that plaintiff cannot establish the requisite underlying constitutional violation to maintain her § 1983 individual capacity claims.

    a. Plaintiff has stated sufficient facts to support her Due Process Claims.

        I. Plaintiff had private property and liberty interests that were affected by the official action.

        II. The University's response posed a serious and imminent risk of an erroneous deprivation of plaintiff's property and liberty interests.

        III. The University could have taken steps to prevent the deprivation of plaintiff's property and liberty interests without undertaking actions that were detrimental to any government interest and without imposing additional fiscal and administrative burdens on the University.

    b. Plaintiff has provided sufficient specific facts to support her equal protection claim

8. Plaintiff objects to the R&R's recommendation that this court should decline to exercise supplemental jurisdiction over her state claims.

## OBJECTIONS

1. THE REPORT DOES NOT COMPLY WITH THE LEGAL STANDARD REQUIRED FOR DECIDING A MOTION TO DISMISS FILED UNDER FED. R. CIV. P 12(B)(6).
    a. **The Report does not draw all reasonable inferences in favor of the nonmoving party.**
        I. <u>The Report fails to draw reasonable inferences from the timeline described in Plaintiff's Second Amended Complaint.</u>

Plaintiff reported her sexual assault in August 2015, requested that TTU investigate her

assault in November 2015 and engaged an attorney to "assist her with her communications with

TTU" in January 2016. (*See* Second Amended Complaint, Docket No. 17*).* The first reasonable

inference to be made is that it would have been unnecessary for Plaintiff to engage an attorney

for the purposes of assisting her with her communications with TTU if she had already had

success in such communications on her own. The mere fact that Plaintiff engaged an attorney

for this purpose strongly infers that TTU's correspondence with Plaintiff between November

2015 and January 2016 was superficial and inconsequential.

## II.    The Report draws inferences in a light most favorable to Defendants

The R&R incorrectly concludes that "The University was responding to Plaintiff's allegations and the University was conducting an investigation." (Docket No. 49, p. 42).

> *"Plaintiff had regular communication multiple meetings with University employees regarding, inter alia, her attack, the investigation, her PTSD and other psychological effects, and her declining grades and resultant financial aid difficulties." Id.*

Plaintiff's Second Amended Complaint does address TTU's failure to help mitigate damages caused by her declining academic performance following her assault, stating in relevant part: "Defendant Hall failed to inform [Plaintiff] that there might be remedies available to have to have these courses removed from her transcripts and GPA". (Docket No. 17, p. 12). Tennessee Tech's Sexual Misconduct Policy lists interim measures that TTU may take while investigating a report of sexual misconduct, including:

> *"Arranging for the complainant to re-take a course or withdraw from a class without penalty, including ensuring any changes do not adversely affect the complainant's academic record". (See* Docket No. 47, p. 23, TTU Policy 143, XVI (A)(7).)

Plaintiff's academic struggles, which are easily identifiable upon review of her academic record before and after her assault strongly imply that such accommodations were needed but not provided.

b. **The Report does not liberally construe the complaint in the light most favorable to the nonmoving party.**

When reviewing pleadings written by an unrepresented party, the court must "liberally [construe] a pleading filed by a pro se litigant to allow for the development of potentially meritorious claims." *See Boag v. MacDougall,* 454 U.S. 364, 365 (1982). When reviewing a motion to dismiss, the court must construe the complaint in the light most favorable to the

plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff. *See Directv v. Treeth,* 487 F. 3d 471,476 (6th Cir. 2007).

There are several instances within the R&R in which the elements of the complaint have been construed in the light most favorable to Defendants. On page 44 of the R&R, there is a footnote containing a quote from Plaintiff's Second Amended Complaint but the emphasis has been modified so as to be construed in a light most favorable to Defendants. (Docket No. 49, p. 44).

The R&R reports that there were many documents which were "obtained and reviewed" by Defendants, but this was not action taken on the part of Defendants (Docket No. 49 at 37-38). Plaintiff kept meticulous notes and files regarding all aspects of her assault and, after requesting a university investigation she voluntarily provided her medical records, legal documents, and cell phone communications to TTU officials to facilitate their investigation. The postulation that Defendants acquired these documents through their own means or efforts is categorically false. Any attempt to portray the gathering of this documentation as evidence of an investigation is an attempt to construe the facts in the light most favorable to Defendants.

2. PLAINTIFF OBJECTS TO CERTAIN FACTUAL FINDINGS AND OMISSIONS IN THE R&R.
   a. **The R&R erroneously concludes that Defendants have not been given proper notice of the allegations against them.**

The first assertion made by the Magistrate Judge in his discussion of the "Case at Bar" is that Plaintiff should not be able to "circumvent the notice requirements by constantly being permitted to submit iterations to her filings" (internal citation omitted) (Docket No. 49, p. 34). The R&R asserts that "Fairness [therefore] entails Defendants knowing what allegations are against them and being able to respond accordingly". The Report's recommendation that Plaintiff's should be denied the opportunity to amend her complaint, appears to be based on the

inference that Plaintiff has failed to provide Defendants with the required notice of the allegations against them, which is untrue.

Chief Judge Crenshaw issued an Order requesting reconsideration of Defendants' Motion to Dismiss in light of the Sexual Misconduct Policy and Investigation Memorandum supplied by plaintiff in her Objections to the Initial Report and Recommendation. Judge Crenshaw's Order reads, in part:

> *"[T]he Court finds that this is not a case where Plaintiff has been long delinquent in asserting her position or has deliberately saved her knockout punch for the second round" (internal citation omitted). (Docket No. 48, p. 3).*

Furthermore, Defendants' have not expressed any sense of ambiguity or uncertainty in the understanding of the claims against them in any of their previous filings.

b. **The R&R erroneously concludes that Plaintiff's Due Process claims are based only on TTU's dissention from their own procedures.**

Throughout the Report, there is emphasis on the fact that a state cannot be said to have a federal due process obligation to follow all of its procedures (Docket No. 49, pp. 5, 31-32, 35) (citation omitted). Plaintiff does not dispute the assertion that "failure to follow official policies can [therefore] be a relevant consideration, but is not, in and of itself, sufficient to impose liability" and she has not attempted to impose liability on Defendants' based only on a failure to abide by official policies. (*Id. p. 35*)

Plaintiff's contention is not that TTU violated her Due Process rights soley by deviating from their policies nor does she dispute that TTU could have honored her Due Process rights without adhering to their own policies, however Defendants failed to take any action consistent with their policies or any substitute procedures that could have been used to safeguard Plaintiff's rights.

The R&R provides some useful citations for evaluating Due Process claims under the Fourteenth Amendment but does not accurately align the facts of Plaintiff's case with the text of the citation. The R&R states, in part:

> "The Fourteenth Amendment's Due Process Clause has a substantive component that is separate and distinct from its procedural component. Seum v. Osborne, 348 F. Supp. 3d 616, 633 (E.D. Ky 2018), citing Howard v. Grinage, 82 F.3d 1343, 1349 (6th Cir. 1996). The substantive component serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used. Id The goal of the procedural component is to minimize the risk of substantive error, to assure fairness in the decision-making process, and to assure that the individual affected has a participatory role in the process."

The violations of the substantive component of the Due Process Clause that were committed by Defendants were, in fact, separate and distinct from the procedural violations. The procedural violations are evident from a comparison of Defendants' action with TTU Policy 143, while the substantive violations are those arising from Defendants' refusal to keep Plaintiff informed as to the status of her complaint or to allow her to meaningfully participate in any investigation and from Defendants' disparate treatment of Plaintiff and Respondent after the filing of her report.

c. **Plaintiff objects to the R&R's assertion that Plaintiff was given the opportunity to be meaningfully heard during TTU's investigation.**

Several pages of the Report are dedicated to listing the ways in which the "University was responding to Plaintiff's allegations", but there is no indication in any of the elements in this list that Plaintiff had the opportunity to be meaningfully heard. (Docket No. 49 at 37, 38, 42).

The R&R incorrectly concludes that "The investigation memorandum therefore establishes that Plaintiff was given sufficient opportunities to be heard and meaningfully participate in the investigation process such that she received the Due Process guaranteed under

the Fourteenth Amendment." (Docket No. 49, pp. 38). Plaintiff does not dispute the fact that she had correspondence with Defendants on several occasions or that she provided critical documentation in support of her complaint. However, Plaintiff was never given the opportunity to *meaningfully* participate in the investigation process. All correspondences with Defendants were superficial in nature and that they produced no actual opportunity for Plaintiff to be heard. (*See* Docket No. 27 pp. 14-18, AND, Docket No. 17, pp. 10-15).

Plaintiff's communications with Defendants cannot be characterized as meaningful because they produced no result. The R&R reports that [...there are no allegations in the record concerning what, if anything, may have occurred between May 16, 2016 and January 11, 2017...]. The Collins English Dictionary defines "meaningful" as "full of meaning; having significance or purpose" and further states that "If you describe something as meaningful, you mean that it is serious, important, or useful in some way." The fact that seven months passed in which nothing happened indicates that, any opportunity that Plaintiff had been given to be heard before May 2016 was not meaningful in any way, as it was not significant or purposeful.

**3.** PLAINTIFF OBJECTS TO THE R&R'S CONCLUSION THAT NO EXCEPTIONS TO ELEVENTH AMENDMENT IMMUNITY ARE APPLICABLE TO THIS CASE.

With respect to the exceptions from Eleventh Amendment Immunity which apply to this case, the Report states:

> [A]lthough Plaintiff argues in her Objections to the contrary, no exceptions to Eleventh Amendment immunity are applicable to Plaintiff's § 1983 official capacity claims. Accordingly, Plaintiff cannot maintain her § 1983 official capacity claims against Defendants. (Docket No. 49, p. 36)

Although this statement is preceded by a recitation of some general components of Eleventh Amendment Immunity, it is conclusory in nature. The Report does not cite any

authority which would indicate that "no exceptions to Eleventh Amendment Immunity are applicable to this case". According to published guidance from the Department of Justice:

> *"It is the position of the Department of Justice that Section 2000d-7 is an unambiguous abrogation which gives States express notice that a condition for receiving federal funds is the requirement that they consent to suit in federal court for alleged violations of Title IX and the other statutes enumerated".(See "Section IX- Private Right of Action & Individual Relief Through Agency Action."* The United States Department of Justice, 26 Jan. 2017).

The additional legal standards used to explain the relevant exceptions are further detailed in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss and are incorporated herein by reference. (*see* Opp'n to MTD, Docket No. 27, pp. 6-8).

**4.** PLAINTIFF OBJECTS TO THE R&R'S ASSERTION THAT TITLE IX DOES NOT PROVIDE FOR THE IMPOSITION OF INDIVIDUAL LIABILITY

The Supreme Court has clarified that claims under Title VI and Title IX remain enforceable under an implied private right of action. *See* Cannon v. University of Chicago, 441 U.S. 677 (1979). The Rehabilitation Act adopts the remedies of Title VI and thereby also utilizes an implied right of action. (Rehabilitation Act, 29 U.S.C. § 794a(a)(2). *See Lane v. Peña, 518 U.S. 187, 191-192 (1996).*

In Fitzgerald v. Barnstable the Court held explicitly that "Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing constitutional rights. Accordingly, we hold that § 1983 suits based on the Equal Protection Clause remain available to plaintiffs alleging unconstitutional gender discrimination in schools." (*Fitzgerald v. Barnstable School Committee*, 555 U.S. 246, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009)).

**5.** PLAINTIFF OBJECTS TO THE REPORT'S CONCLUSION THAT THE ALLEGATIONS CONTAINED IN PLAINTIFF'S SECOND AMENDED COMPLAINT DO NOT DEMONSTRATE THAT THE UNIVERSITY WAS DELIBERATELY INDIFFERENT TO PLAINTIFF'S PEER-ASSAULT AND HARASSMENT.

### a. Defendants' conduct was clearly unreasonable in light of the known circumstances

The Davis Test requires that, for a University to be held liable for deliberate indifference, it's response must have been "unreasonable in light of the known circumstances". Defendants knew that Plaintiff had been raped by Respondent and yet they did not even notify Respondent of the allegations against him, let alone begin an investigation, for at least three months after Plaintiff's complaint was filed. (*See* Second Am. Compl., Docket No. 17 pp. 9-11). The meetings and conversations among Plaintiff and Defendants during these three months were merely a façade and Ms. Hall's repeated reassurances were dilatory tactics intended to avoid the initiation of an investigation.

> I. Defendants allowed months of inactivity to permeate their purported investigation

Defendants were aware that Plaintiff was experiencing high levels of distress about being constantly uninformed about the status of an investigation and about possibly encountering her rapist on campus while awaiting the conclusion of the investigation, but this did not stop them from turning their backs on it for months at a time. The R&R quotes TTU's Investigative Memorandum, stating, in part:

> *"neither Plaintiff nor Defendants were aware that Plaintiff's alleged attacker had returned to the University until February 6, 2016, when Plaintiff reported that she had seen her averred attacker walking on campus and Defendants conducted a new Banner check confirming that Plaintiff's alleged attacker was once again enrolled in the University."* (Docket No. 39 p. 46) (Quoting Investigative Memorandum).

If Defendants were actively investigating Plaintiff's complaint, then they should have known about Respondent's enrollment status and should have warned Plaintiff that he was still taking classes and that she might encounter him on campus.

A second instance in which Defendants' clearly abandoned the investigation can be easily

inferred from the dates on the Investigation Memorandum. The first page of the Investigative

Memorandum reads, in part:

TTU Policy 143 (Sexual Misconduct)

INVESTIGATION MEMORANDUM

To: Marc Burnett, Vice President for Student Affairs

From: Marlene Hall, Title IX Coordinator

Subject: Sexual Misconduct Investigation

Date: January 26, 2017

Plaintiff was unaware that an investigation had been concluded and did not receive a copy of the

Investigative Memorandum until March 30 2017, more than eight weeks after it was sent from

Title IX Coordinator, Defendant Marlene Hall, to the Vice President of Student Affairs,

Defendant Mark Burnett. In the absence of any attempt to explain such delays, it is more than

reasonable to deduce that Defendants' conduct constitutes deliberate indifference to Plaintiff's

report.

II. The time that it took for Defendants to conduct and conclude an investigation into Plaintiff's complaint was excessive.

In Hyut v. State Univ of New York, the court found that

> "*Deliberate indifference may be found both when the defendant's
> response to known discrimination is clearly unreasonable in light
> of the known circumstances... and when remedial action only
> follows after a lengthy and unjustified delay." Hayut v. State Univ.
> of New York, 352 F.3d 733, 751 (2d Cir. 2003)* (internal quotation
> marks omitted).

The United States Department of Education's Office of Civil Rights recently reviewed

Washington State University's handling of multiple reported cases of student - student sexual

assault and determined that the school had violated its obligations under Title IX for failing to

promptly respond to several of these complaints. The investigative findings were described in a letter from the OCR stating, in part:

> "For these three complaints (taking 139, 218 and 125 days to complete), there was no evidence in the university's investigative files to justify the delays in the investigation, and when interviewed about the delays, a university official cited a lack of investigatory resources as the reason for the delays. OCR finds that this is an insufficient justification under Title IX for a lack of prompt investigations, and as such, finds the university violated Title IX in these three specific instances. "See OCR Letter of Findings for WSU; OCR Reference Nos. 10122142, 10152153, and 10182046.

In the current case, it took 504 days for the investigation to be completed. Finally, even if Defendants had begun an investigation into Plaintiff's complaint in a timely manner, the nature of Plaintiff's complaint was so serious that it was imperative that the University complete an efficient and effective investigation and it would have been irresponsible and unlawful for Defendants to knowingly allow periods of inactivity to permeate such an investigation to the extent that they would cause a sixteen-month delay.

### III. Defendants' refused to provide Plaintiff with requested information about the status or existence of an investigation.

A number of email exchanges evidence the multiple times that Plaintiff requested information or explanation regarding a timeline for the initiation and/or conclusion of an administrative investigation and Defendants declined to provide information. Given that the complaint was based on a report that Plaintiff was raped by a fellow student, this response was clearly inadequate and unreasonable. Some examples of such emails include:

On January 19, 2016, Plaintiff emailed Defendant Hall, writing:

> "If it's starting to look like we won't be able to proceed, for whatever reason. I'd rather know now than in the middle of the semester ".

On February 10, 2016, Plaintiff emailed Defendant Hall, writing:

> *"You are probably tired of having to constantly reassure me, but I*
> *have to do what is best for me and if there is a reason to believe*
> *that this investigation won't ever happen, I'd rather know now than*
> *find out in the middle of the semester"*

On May 2, 2016, Plaintiff's former attorney, Mr. Alex Little, wrote to Defendant Hall on

Plaintiff's behalf to request that TTU provide "an immediate update" regarding the status of the

investigation. On May 6, 2016, University Counsel, Defendant Carpenter sent an email to Mr.

Little in which she refused to provide an update about the investigation or initiate disciplinary

action against Respondent.

### b. Defendants' conduct caused Plaintiff to be vulnerable to further harassment

Contrary to the assertion of the R&R, a lack of post-notification harassment is not

sufficient to preclude conduct that is deliberately indifferent in cases of student-on-student sexual

harassment. In Farmer v. Kansas State University, the court addressed the university's failure to

respond to the plaintiff's sexual assault complaint, saying:

> *"the courts that have directly addressed this issue have held that*
> *Davis requires that the funding recipient's deliberate indifference*
> *leave the student liable or vulnerable to further harassment, not*
> *that further harassment actually occur. Courts have consistently*
> *recognized That a student need not allege multiple instances of*
> *sexual assault to state a plausible Title IX claim. " (Citing*
> *Kinsman v. Fla. State Univ. Bd. of Trs. 2015. And Korosek y.*
> *Regents of the Univ. of Col. 2015)* (internal quotations omitted).

In Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, Plaintiff

explains that Respondent's presence on campus was harassing because it exposed her the

possibility of an encounter with him. Plaintiff also clarifies that TTU's continuous empty

promises to notify Respondent of the Report against him caused her to be constantly fearful that

any day could be the first day that Respondent knew she reported the assault.

**6.** PLAINTIFF OBJECTS TO THE REPORT'S ASSERTION THAT THE LEGAL STANDARDS FOR TITLE IX AND U.S.C. *§* 983 CANNOT BE MUTUALLY EXCLUSIVE.

It is true that the elements of claims under Title IX and Section 1983 are distinct and separate, but the two standards need not be conflated to be conflicting. Plaintiff's objection is not based on the legal standards being mutually exclusive overall, rather she objects to the R&R's attempt to confer upon Defendants different roles in order to argue different issues. If defendants are considered to be a public entity for the purposes of avoiding liability under Section 1983, then they must also be considered a public entity for purposes of determining liability under Title IX. The R&R recommends dismissal of Plaintiff's Title IX claims against Defendants in their individual capacities by reasoning that "Title IX does not provide for the imposition of individual liability; rather, Title IX applies to recipients of federal funds. Because the individual Defendants are not themselves recipients of federal funds, they cannot be held liable" (Docket No. 49, p. 40).

**7.** PLAINTIFF OBJECTS TO THE R&R'S CONCLUSION AND REASONING THAT PLAINTIFF CANNOT ESTABLISH THE REQUISITE UNDERLYING CONSTITUTIONAL VIOLATION TO MAINTAIN HER § 1983 INDIVIDUAL CAPACITY CLAIMS.

**a. Plaintiff has stated sufficient facts to support her Due Process Claims**

The Supreme Court summarized the nature of the due process requirements in *Matthews v. Eldridge,* stating in part: "[T] he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." The Court further explained the three factors that are considered when determining the specifics of due process required:

*First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.*

*Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).*

I. Plaintiff had private property and liberty interests that were affected by the official action

The facts contained in Plaintiff's Second Amended Complaint clearly identify the property and

liberty interests that were affected by Defendants' actions. The complaint states, in part that:

> *"following Respondent's assault of her, Respondent's presence on campus and the accompanying risk that she might encounter him created a hostile environment that effectively deprive[d] her of the educational opportunities of benefits provided by the school". Id* at 9.

These benefits constitute a private property interest. The deprivation of Plaintiff's liberty

interest in the right to acquire useful knowledge is also exemplified by many facts contained in

the complaint, including the statement that:

> *"Plaintiff described severe emotional effects which she had been suffering since her assault by Respondent. These effects included difficulties with focus and problems with her working memory. Hall confirmed that many of the psychological effects described by Plaintiff in this meeting were not uncommon for a victim to experience in the aftermath of a rape. "*

Since working memory and focus are both imperative cognitive functions for the development of

new concepts and the understanding and processing of new information, these impairments

barred Plaintiff from the freedom to acquire useful knowledge as long as TTU continued to allow

the hostile educational environment to exist.

II. The University's response posed a serious and imminent risk of an erroneous deprivation of Plaintiff's property and liberty interests

Plaintiff spoke to Defendants about her impaired focus and her inability to freely access

University resources and she explained that these limitations resulted from her fear of

encountering her attacker on campus. Plaintiff's Second Amended complaint includes several

examples of such conversations. *Id* at 9, 11 and 15. Plaintiff's status as the victim of a sexual

assault does not preclude her from being subject to violations of due process by the bodies tasked

with investigating such claims. TTU's conduct deprived Plaintiff of the property and liberty

interests and specific examples are described in Plaintiff's Objections and previous filings. Plaintiff's Objections reference TTU's published procedures to point out that TTU was aware of its obligations to take *some* action to help Plaintiff mitigate the property and liberty interests which were sure to be endangered by the constant possibility that she might encounter her attacker on campus.

Plaintiff had a property interest in benefits offered by the university and a liberty interest in the freedom to acquire useful knowledge, both of which were denied to her by Defendants' conduct. Defendants' empty promises of a pending investigation kept Plaintiff in a state of limbo, not knowing if her attacker knew she had reported him or if TTU had even begun investigating her attack.

III.  <u>The University could have taken steps to prevent the deprivation of Plaintiff's property and liberty interests without undertaking actions that were detrimental to any government interest and without imposing additional fiscal and administrative burdens on the University.</u>

The Dear Colleague Letter addresses the responsibility of the Title IX coordinator, stating in part:

> *"The Title IX coordinator is responsible for coordinating the recipient's responses to all complaints involving possible sex discrimination. This responsibility includes monitoring outcomes, identifying and addressing any patterns, and assessing effects on the campus climate." See* Dear Colleague Letter, Washington, DC: U.S. Department of Education, Office for Civil Rights.

Therefore, it is clear that one key function of a Title IX Coordinator is to be available to respond to complaints of sexual harassment and sexual assault. The designation of an employee to oversee this responsibility should allow schools to be available to promptly respond to such complaints without causing additional fiscal or administrative burdens to existing university faculty or campus services. Furthermore, in the OCR's recent letter regarding violations of Title

IX at WSU, it found that a lack of investigatory resources was not sufficient to justify excessive

delays in investigating complaints of sexual assault. The letter states, in relevant part:

> "*Specific examples that illustrate the OCR's concern regarding
> promptness include a complaint that took 234 days for the
> investigation to be completed with no evidence in the file to justify
> the delay; a complaint that took 311 days for the investigation and
> sanctions process to be completed with no explanation in the file
> for the delay, which OCR believes may have contributed to an
> ongoing hostile environment for the complainant and other
> students; and a complaint that took 170 days for the investigation
> and sanctions to be completed and for which the university's
> explanation for the delay was not sufficient to justify the 170 day
> time frame*". *See* OCR's Letter of Findings to WSU.

### b. Plaintiff has provided sufficient specific facts to support her Equal Protection Claim

The R&R states the following about Plaintiff's Equal Protection claim:

> "*Plaintiff fails, however, to allege that she is a member of a
> protected class, and that Defendants intentionally discriminated
> against her on the basis of her membership in that protected class.
> See, e.g., Henry, 922 F. 2d at 341. Accordingly, Plaintiff cannot
> sustain her Equal Protection claim and it should be dismissed*".

Plaintiff contends that, since many of her claims relate to TTU's mishandling of her report of

sexual assault, and since sex/gender is a protected class, it can be reasonably inferred that her

Equal Protection claims are based on sex discrimination. A document filed *pro se* is "to be

liberally construed," *Estelle,* 429 U.S., at 106, 97 S.Ct. 285, and "a *pro se* complaint, however

inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by

lawyers," *ibid.* (internal quotation marks omitted). Cf. Fed. Rule Civ. Proc. 8(f) ("All pleadings

shall be so construed as to do substantial justice").

The disparate treatment giving rise to Plaintiff's Equal Protection Claim was manifested

through the following actions: Plaintiff was interviewed multiple times without an attorney

present, whereas Respondent was only interviewed once, with his attorney at his side. Plaintiff

was required to provide a written statement of her account but Respondent was not. Plaintiff's access to university resources were limited by her fear of her attacker, whereas Respondent continued to enjoy full access to all university common areas and benefits. Finally, and most importantly, Defendants stalled the conclusion of their investigation until Respondent had voluntarily left the University and thus Defendants denied Plaintiff the opportunity to be heard at a meaningful time.

Furthermore, the University's dismal response to Plaintiff's complaint effectively protected Respondent and safeguarded *his* interests in benefits offered by the school at the expense of Plaintiff's property and liberty interests. Since TTU is a public entity, all of Defendants' internal emails will be available during discovery and will likely produce additional evidence of Defendants' motivations to protect Respondent at Plaintiff's expense.

**8.** PLAINTIFF OBJECTS TO THE R&R'S RECOMMENDATION THAT THIS COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER HER STATE CLAIMS.

Plaintiff, at this stage of the proceedings, has sufficiently alleged facts that indicate that Defendants' acted unlawfully and states a claim upon which relief can be granted. Since Plaintiff has set forth sufficient facts, with respect to her claims under Title IX and her claims under U.S.C. *§ 1983,* to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), this Court should also exercise its jurisdiction to Plaintiff's State Law Claims

## CONCLUSION

Plaintiff's Second Amended Complaint alleges sufficient facts to indicate that there is far more than a mere possibility that Defendants acted unlawfully and Defendants' Motion to Dismiss should not be granted. The general standard used for determining liability for an inadequate response by a university to student sexual harassment relies largely on whether the

action taken by the university was unreasonable in light of the known circumstances. Defendants knew that Plaintiff reported that she had been raped by another TTU student, that Plaintiff was suffering emotional and cognitive impairments as a result, and that Plaintiff was effectively unable to freely access resources offered by the University, and yet Defendants failed to initiate an investigation for 100 days after Plaintiff filed her complaint and did not conclude the investigation until Respondent had already left the University. This response was clearly unreasonable in light of the known circumstances and Plaintiff has sufficiently alleged facts that support her claims.

Furthermore, Plaintiff has cited authorities to indicate that Title IX does not preclude a concurrent claim for Equal Protection violations under 42 U.S.C. 1983 and therefore her individual capacity claims against Defendants should not be dismissed. She has also referenced relevant sources to show that Defendants are not protected from official capacity claims by any immunity doctrines. Finally, she has asserted specific facts which fulfill each of the elements of her claims for violations of rights protected by the Fourteenth Amendment.

As the court stated in Ricco v. Potter, "A Rule 12(b)(6) motion should not be granted unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief. Ricco v. Potter, 377 F. 3d 599 (6th Cir. 2004)(quoting Cameron v. Seltz, 38 F.3d 264,270 (6th Cir. 1994) (quotation omitted)) For the reasons stated in this document, Defendants' Motion to Dismiss should be denied.

Respectfully signed this 28th day of June, 2019.

Sarah Beth Cain

Plaintiff

_____6/28/19_____
(Date)

_Sarah Beth C._
(Signature)

_Sarah Beth Cain_
(Printed Name)

_500 Dry Valley Rd._
_Apt. E306_
_Cookeville, TN 38506_
_(615) 485-3459_

(Address and Telephone Number)